In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 02-60050

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

RUBY BUCK,

Defendant-Appellant.



_____

Appeal from the United States District Court
for the Northern District of Mississippi

_____

March 17, 2003



Before GARWOOD, SMITH, and BARKSDALE,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

   Ruby Buck was convicted of misapplying
federal funds and submitting false documents.

She appeals her conviction on the ground that
the district court erred in admitting a summary
chart into evidence; she appeals her sentencing
on several grounds. We dismiss a portion of
the appeal for want of jurisdiction and affirm
on the remaining issues.

## I.

### A.

Buck worked for Mississippi Action for Community Education ("MACE") beginning in 1976. She held various positions until November 1995, when she became interim president and CEO of MACE; she was appointed to the position permanently in July 1996 and held the position until her resignation in May 2001.

MACE was a nonprofit rural development organization funded in part by federal grants under the Corporation for National Service AmeriCorps Program ("AmeriCorps"). The Congressional Hunger Center ("CHC"), a nonprofit corporation, received AmeriCorps grants and sub-granted these funds to several groups, including MACE. From 1996 to 2000, MACE received $660,423.93 through AmeriCorps grants that were intended to provide living stipends for AmeriCorps members working in MACE's Anti-Hunger Partnership and Empowerment Program.

Instead, a significant portion of the grants was used to pay all or part of the salaries of MACE employees that were ineligible for AmeriCorps funding. Even the mayor of Metcalfe, Mississippi, a member of the Board of Directors of MACE, received a stipend as an AmeriCorps volunteer. Many of these individuals testified that they did no AmeriCorps work. Buck was responsible for submitting numerous documents that facilitated the illegal payments.

### B.

Buck was convicted of one count of misapplication of federal funds in violation of 18 U.S.C. § 666(a)(1)(A) and fourteen counts of submitting false documents stating that thirteen recipients of funds were AmeriCorps volunteers in violation of 18 U.S.C. § 1001(a). The false statements resulted in the misapplication of $116,751.67 in AmeriCorps funds. Buck was sentenced to forty-one months' imprisonment.

## II.

### A.

Buck challenges the admission into evidence of a summary diagram that depicted the connections between her and the misapplied payments.[1] She argues that the summary amounted to "propaganda" because it drew an arrow from a logo representing MACE to her name without making any reference to others involved in authorizing the expenditures, suggesting that Buck directed the improper expenditures. She states that evidence presented at trial contradicted this implication.

Where a sufficient objection is made to the evidence, we review for abuse of discretion. *United States v. Hart*, 295 F.3d 451, 454 (5th Cir. 2002). "If the court errs in its evidentiary ruling, the error can be excused if it was harmless. In applying this rule, we have stated: A nonconstitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 454-55 (citations and quotation marks omitted).

---

[1] The MACE logo was placed near the center of the summary, with fifteen lines drawn from the logo to the names of fifteen MACE employees. The summary listed the number of checks and total amount received by each employee. Above the MACE logo was a red line pointing to two captions, "MACE Board of Directors" and "Ruby Buck, CEO/President." Buck's picture was included above the caption, but the district court required that it be covered with tape, leaving only her name and title visible.

Although Buck describes the summary as having been admitted under FED. R. EVID. 1006[2] and argues the issue in terms of that rule and related caselaw, no rule was cited by either side or the court during the arguments over admissibility. The government argues the case on appeal under rule 1006 and FED. R. EVID. 611.[3]

### B.

The summary diagram was not admissible under rule 611(a) or rule 1006:

> Rule 1006 allows admission of summaries in lieu of having the voluminous originals presented at trial. This use of summaries in this manner should be distinguished from charts and summaries used only for demonstrative purposes to clarify or amplify argument based on evidence that has already been admitted . . . . Although some Courts have considered such charts and summaries under Rule 1006, the Rule is really not applicable because pedagogical summaries are not evidence. Rather, they are demonstrative aids governed by Rules 403 and 611.

5 STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL § 1006.02[5], at 1006-6 (8th ed. 2002) (footnotes omitted).[4]

The diagram was plainly a pedagogical aid. It was not introduced, per the proper use of rule 1006, to summarize documents or other evidence too voluminous to present effectively and efficiently to the jury.[5] Rather, the diagram summarized evidence that had already been presented. *See United States v. Griffin*, 2003 U.S. App. LEXIS 4080, at \*33-\*41 (5th

---

[2] Rule 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

[3] Rule 611(a) provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

[4] "The confusion about summaries occurs where pedagogical devices, used as illustrative aids, such as information presented on a chalkboard, flip chart, or drawing, and the like, are used to summarize or illustrate evidence such as documents." 2 CHARLES E. WAGNER, FEDERAL RULES OF EVIDENCE CASE LAW COMMENTARY, at 1006-5 (2002-2003 ed.)

[5] *See United States v. Meshack*, 225 F.3d 556, 581 (5th Cir. 2000) (stating that summary charts admitted under rule 1006, as contrasted with rule 611, apply to the contents of voluminous writings that have been previously admitted and that are so extensive that in-court review by the jury would be difficult, inconvenient, or imposible); *cf. United States v. Posada-Rios*, 158 F.3d 832, 869 (5th Cir. 1998) ("Since the government did not offer the charts into evidence and the trial court did not admit them, we need not decide whether . . . they were not admissible under Fed. R. Evid. 1006. Where, as here, the party using the charts does not offer them into evidence, their use at trial is not governed by Fed. R. Evid. 1006.").

Cir. Mar. 10, 2003) (No. 01-20368).

It was proper for the diagram to be shown to the jury, to assist in its understanding of testimony and documents that had been produced, but the diagram should not have been admitted as an exhibit[6] or taken to the jury room.[7] Moreover, "[w]here a chart or summary is introduced solely as a pedagogical device, the jury should be instructed that it is not to be considered as evidence but only as an aid in evaluating the evidence." 5 SALTZBURG ET AL., *supra*, § 1006.02[5], at 1006-6 to 1006-7 (footnote omitted). Needless to say, there was no such instruction here, because the court admitted the diagram into evidence.

Despite the fact that it was an error of law, and therefore an abuse of discretion, to admit the diagram, it was harmless, because the diagram accurately summarized testimony and other evidence that had been properly admitted and therefore was already before the jury.[8] Pedagogical charts not admitted under rule 1006 may be presented to the jury (though not admitted into evidence) under rule 611 if they are consistent with the evidence and not misleading. *Pierce*, 753 F.2d at 431.

Under rule 611 or rule 1006, "[t]he essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record."[9] The summary witness testified that Buck was the individual named as applying for the grant and signing all certifications. Previously admitted documents and testimony supported the existence and accuracy of each of the more than three hundred checks that were summarized and showed that Buck had signed all but one. Some of the other individuals that were involved in processing the checks were present during only part of the relevant time period, whereas Buck was a constant.

Buck concedes that "[t]here was nothing improper about the chart's depiction of the trail of the Americorps money that went through MACE and was paid to various individuals." Because the summary is not factually inaccurate, Buck's complaint rests on the

---

[6] Though the prosecutor did not invoke Rule 1006 when introducing the summary, he unambiguously "move[d] its introduction into evidence[.]"

[7] *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000) (stating that although charts may be used as pedagogical devices within the court's discretion under rule 611, jury must be warned that the chart is not evidence and may not go into jury room, absent consent); *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985) (distinguishing between summaries that are admitted under rule 1006 and "other visual aids that summarize or organize testimony or documents that have already been admitted in evidence" and concluding that summaries admitted under Rule 1006 should go to the jury room but that other visual aids should not, absent parties' consent).

[8] Because any error is harmless and hence not reversible, we do not dwell on whether the objection to admissibility that Buck raised at trial was sufficiently articulated for preservation on appeal. *See* FED. R. EVID. 103(a)(1). Moreover, the government does not assert that the objection was inadequate.

[9] *United States v. Diez*, 515 F.2d 892, 906 (5th Cir. 1975) (considering a summary under rule 611); *accord United States v. Jennings*, 724 F.2d 436, 442 (5th Cir. 1984) (considering a summary under rule 1006).

4

argument that it is misleading because it *implies* that she was responsible for each transaction and that no one else was involved. Even if the jury could infer this from the summary, Buck had ample opportunity to present evidence demonstrating the involvement of other parties and had the chance to cross-examine the summary witness concerning the involvement of others.[10] Accordingly, the admission of the summary into evidence did not occasion undue prejudice and was harmless.

### III.

In regard to her sentence, Buck presents two challenges to the decision to add a two-level increase to her offense level for "abuse of trust" under U.S.S.G. § 3B1.3 (2000).[11] She argues that fraud inherently includes the abuse of trust element, and therefore it is inappropri-

---

[10] The record indicates that Buck took advantage of these opportunities, reducing the chance of any prejudice. *See United States v. Winn*, 948 F.2d 145, 159 & n.36 (5th Cir. 1991); *see also United States v. Norton*, 867 F.2d 1354, 1363 (11th Cir. 1989) ("Furthermore, where, as here, the defense conducted a thorough cross examination of the witness concerning the disputed matters, and also had the opportunity to present its own version of those matters, the likelihood of any error in admitting summary evidence diminishes.") (citing *Jennings*, 724 F.2d at 442; *United States v. Means*, 695 F.2d 811, 817 (5th Cir. 1983)).

[11] Buck was sentenced under the 2000 version of the guidelines, because the district court determined that sentencing under the 2001 guidelines would result in a longer sentence and violate the *ex post facto* clause of the Constitution. Some holdings in this opinion may not be relevant to subsequent versions of the guidelines, given that the guideline section for fraud, U.S.S.G. § 2F1.1 (2000), has been deleted and consolidated with U.S.S.G. § 2B1.1 effective November 1, 2001. *See* U.S.S.G. app. C, amend. 617 (2001).

ate to apply the enhancement. She also contends that to be eligible for the enhancement, a defendant must be in a position of trust with respect to the victim of the crimeSSin this case the governmentSSand she avers that she was not in such a position.

We review findings of fact for clear error and the application of the sentencing guidelines *de novo*. *United States v. Scurlock*, 52 F.3d 531, 539 (5th Cir. 1995). "'A factual finding is not clearly erroneous as long as the finding is plausible in light of the record as a whole.'" *Id.* (quoting *United States v. Brown*, 7 F.3d 1155, 1159 (5th Cir. 1993)).

### A.

Buck argues that the abuse of trust enhancement is inapplicable to fraud convictions. The enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]" § 3B1.3. "This adjustment may not be employed if an abuse of trust or skill *is included in the base offense level or specific offense characteristic*." *Id.* (emphasis added). Buck reasons that all fraud sentenced under § 2F1.1 inherently includes an abuse of trust, because the perpetrator must somehow mislead or trick the victim, rendering further sentence enhancement for abuse of trust inappropriate.

Although this court has affirmed an abuse of trust enhancement to a sentence for fraud under § 2F1.1, *see., e.g., Scurlock*, 52 F.3d at 541, it has not addressed Buck's specific argument that all fraud includes an abuse of trust. In *United States. v. Fisher*, 7 F.3d 69, 70 (5th Cir. 1993), we determined that § 3B1.3 may apply to embezzlement convictions, sentenced under U.S.S.G. § 2B1.1, because abuse of

5

trust is not included in the base offense level for embezzlement. In so holding, we found support in the reasoning of three sister circuits distinguishing between breach of trust, which is implicit in embezzlement, and abuse of trust, which requires more egregious conduct.[12] We should view fraud similarly, distinguishing between the breach of trust necessary to commit fraud and more egregious conduct and discretion necessary to trigger an abuse of trust enhancement.

Buck argues that other circuits have proscribed application of the enhancement for fraud convictions. She principally cites *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995), holding that a defendant convicted of making false statements was not eligible for an abuse of trust enhancement. The defendant, an employee of a NASA contractor, failed to notify NASA that its interest rate on some financed equipment had gone down since its last

submission, and later certified that its submissions were "accurate, complete, and current," resulting in a cost estimate that was incorrect by $2.1 million. *Id*. at 454-55. The court held that "Broderson's fraudulent conduct was signing the certificate stating that Grumman had complied with TINA and FAR. Any abuse of trust was therefore 'included in the base offense level' of six for fraud and deceit." *Id*. at 456.

*Broderson* does not stand for the proposition that the abuse of trust enhancement can *never* be applied to a fraud sentence; rather, it is limited to its facts, and any breach of trust arose only from the submission of a false statement, which was minimally necessary to commit fraud. After *Broderson*, the Second Circuit, in affirming an abuse of trust enhancement to a sentence for mail fraud, held:

> An abuse of trust enhancement may not be imposed on a defendant convicted of fraud solely because of a violation of a legal obligation to be truthful and a victim's reliance on a misrepresentation. Every fraud involves these elements. Instead, a court must determine the extent to which the defendant's position provides the freedom to commit a difficult-to-detect wrong. In other words, we have said, the defendant's position must involve discretionary authority.

*United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001) (citations and quotation marks omitted).[13] We adopt this portion of *Hirsch*

---

[12] *Fisher*, 7 F.3d at 70 (citing *United States v. Christianse*n, 958 F.2d 285, 287-88 (9th Cir. 1992); *United States v. Milligan*, 958 F.2d 345, 347 (11th Cir. 1992); *United States v. Georgiadis*, 933 F.2d 1219, 1225 (3d Cir. 1991)). In *Christiansen*, the court noted that the commentary to the guidelines specifically contemplates the application of § 3B1.3 to an embezzlement case. 958 F.2d at 287. "It follows that, at least in those instances involving embezzlement by someone in a significant position of trust, the enhancement may be applied." *Id*.

The commentary to the 2000 guidelines contains similar language. After describing what factors demonstrate a position of trust, it states that "[t]his adjustment does not apply to the case of an embezzlement or theft by an ordinary back teller or hotel clerk because such positions are not characterized by the above-described factors." § 3B1.3, cmt. n.1 (2000).

[13] The other case relied on by Buck, *United States v. Garrison*, 133 F.3d 831, 843 (11th Cir. 1998), also fails to support her argument that the abuse of trust enhancement is unavailable for fraud

(continued...)

and uphold the application of the abuse of trust enhancement to a fraud sentence where the defendant employed discretionary authority given by her position in a manner that facilitated or concealed the fraud.[14]

### B.

Buck challenges the determination that she was in a position of trust, arguing that she was not in such a position with respect to the government, the primary victim, because her dealings with the government passed through CHC, and her duties were limited to following government regulations. We have never held, however, nor do the guidelines explicitly require, that the determination whether a defendant occupied a position of trust must be assessed from the perspective of the victim.[15]

Several other circuits have reached this conclusion.[16] We conclude that Buck did abuse a position of trust with respect to the government, and, in the alternative, that her abuse of the position of trust with respect to CHC suffices to sustain the district court's decision.

Buck maintained significant direct ties to the government in directing the AmeriCorps program. The grant was originally awarded directly by AmeriCorps in 1996, while Buck was interim CEO and President of MACE. Though MACE's submissions were *reviewed* and administered by CHC, they were also certifications *to* the government. All of the data submitted by MACE was forwarded to Ameri-Corps; CHC often served as a passthrough, with AmeriCorps reviewing the forms to determine eligibility. AmeriCorps relied on the accuracy of these submissions, because neither it nor CHC could easily verify the validity existence of MACE's grant recipients. Many records prepared by MACE were also subject to on-site inspection by AmeriCorps workers.

---

[13](...continued)
convictions. In fact, the Eleventh Circuit has cited *Garrison* in affirming an abuse of trust enhancement to a fraud sentence. *See United States v. Liss*, 265 F.3d 1220, 1229-30 (11th Cir. 2001).

[14] This is consistent with our approach in *Fisher* and with the guidance of the commentary to § 3B1.3, which states that a position of public or private trust is "characterized by professional or managerial discretion" and advises that "for this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense[.]" § 3B1.3, cmt. n.1.

[15] This requirement, however, has been implied in some of our opinions. For example, in *United States v. Iloani*, 143 F.3d 921, 922 (5th Cir. 1998), we stated:

In this Circuit, it is settled that a § 3B1.3 enhancement is appropriate for a physician who abuses the trust of his patients. However, this Circuit has never considered
(continued...)

[15](...continued)
whether a physician who acts in concert with his patients to conduct a fraudulent billing scheme may be assessed a § 3B1.3 enhancement for abuse of a position of trust on the basis of the physician's relationship with an insurance company.

(Citations omitted.)

[16] *See., e.g., United States v. Thorn*, 317 F.3d 107, 120 (2d Cir. 2003); *United States v. Mackey*, 114 F.3d 470, 475 (4th Cir. 1997); *United States v. Zaragoza*, 123 F.3d 472, 481 (7th Cir. 1997); *United States v. Hill*, 915 F.2d 502, 506 n.3 (9th Cir. 1990); *United States v. Trammell*, 133 F.3d 1343, 1355 (10th Cir. 1998); *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998).

Buck again points to *Garrison*, in which the court did not find a position of trust, in part because the defendant

> did not hold a position of discretion concerning her crime of false reporting to Medicare, as required for application of the abuse-of-trust enhancement. As her counsel explained at sentencing, Garrison lacked the discretion and ability to conceal the false cost reports submitted for Medicare reimbursement and relied on others to accomplish this deception.

*Garrison*, 113 F.3d at 841. The court also credited Garrison's contention that her false statements were made in reliance on financial experts, *id*. at 841 n.19, which mitigated against finding that she had a position of trust.

By comparison, Buck was in perhaps the best position, in terms of discretion and ability, to conceal her false reports from the government. All the false certifications passed through her. Her relationship to those assisting her was employer-employee, giving her significant leverage to gain the complicity of others. Notwithstanding the presence of CHC as intermediary, there is ample support in the record for a finding that Buck occupied a position of trust with respect to the government.

Alternatively, there is little doubt that Buck occupied a position of trust with respect to CHC. In *United States v. Sidhu*, 130 F.3d 644, 655-56 (5th Cir. 1997), we affirmed a § 3B1.3 enhancement where the position of trust was not held with respect to the main victim of the crime. There, a doctor defrauded various government programs and insurance companies by billing patients for services that were not performed or were not performed appropriately. *Id*. at 647. We based our af-

firmance on the defendant's abuse of his patients' trust. This holding may be explained by our determination, for purposes of another sentencing enhancement, that although the government and insurers may have been the "primary victims of his criminal conduct," the patients also were victims of the fraud. *Id*. at 655.

We interpret *Sidhu* to allow the enhancement whenever any victim of a criminal scheme placed the defendant in a position of trust that significantly facilitated the crime.[17] The CHC, as sub-grantor, also was injured by Buck's fraud, as it was unable to distribute the

---

[17] In *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir. 1997), the court took a similar approach, holding that the government is not necessarily the only victim in a tax evasion scheme, and that the § 3B1.3 enhancement can apply if any identifiable victim of the overall scheme to evade taxes put the defendant in a position of trust that facilitated the commission or concealment of the offense. Similarly, in *United States v. Cianci*, 154 F.3d 106, 110-13 (3d Cir. 1998), the court held that enhancement was appropriate in a tax evasion case where the defendant abused a position of trust with his company to embezzle unreported income. Although the defendant had not been charged for any crime in relation to his employer, the abuse of trust could be considered as "relevant conduct" under the guidelines. *Id*. at 112-13.

In *United States v. Duran*, 15 F.3d 131, 132-33 (9th Cir. 1994) (per curiam), the court affirmed an enhancement, allowing a sheriff's use of a position of trust to embezzle money to support an enhancement for the illegal structuring of the financial transactions to avoid reporting requirements. This was allowed despite the fact that the jury failed to reach a verdict on the underlying theft charge, because the theft was part of a common scheme or plan with the illegal structuring under U.S.S.G. § 1B1.3(a)(2). *Id*. at 133.

AmeriCorps funds to deserving sub-grantees that supported its mission. Buck's position of trust with respect to CHC suffices to support the enhancement.

Whether viewed in terms of the government or CHC, the record supports the finding that Buck abused her position of trust. "[T]o determine whether the position of trust 'significantly facilitated' the commission of the offense, [a] court must decide whether the defendant occupied a superior position relative to all people in a position to commit the offense, as a result of [her] job." *Fisher*, 7 F.3d at 70-71.

Buck's abuse of trust was not merely signing the false forms; it extended to her decisions to have employees perform tasks not allowed under the grants and to convince others to falsify numerous documents to defraud the government. Buck was distinguished from her employees by the broad discretion, autonomy, and ability to conceal the falseness of her claims from the government and CHC provided by her position as President and CEO; her responsibility to certifying each employee's validity; and her status as the applicant for the grant. The district court properly enhanced Buck's sentence for abusing a position of trust.[18]

### IV.

Though Buck was convicted of misapplication of $116,751.67 in AmeriCorps funds, evidence of a similar but separate incident, involving misapplication of approximately $88,000 of Department of Labor Welfare-To-Work ("DLWTW") grant funds, was introduced pursuant to FED. R. EVID. 404(b).[19] The district court added this $88,000 when determining the amount of the loss for sentencing purposes under § 2F1.1(b)(1). Buck argues that this conduct was insufficiently related to the fraud to be considered in sentencing.

"The district court's determination of what constitutes relevant conduct for sentencing purposes is a factual finding." *United States v. Nevels*, 160 F.3d 226, 229 (5th Cir. 1998). This finding must be supported by a preponderance of the evidence and is reviewed for clear error. *Id*. For fraud, the guidelines provide a broad reach in including relevant conduct.[20] "All acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," § 1B1.3(a)(1)(A), "that were part of the same course of conduct or common scheme or plan as the offense of conviction," § 1B1.3(a)(2), should be considered. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by *at least one common factor*, such as common victims,

---

[18] The district court did not state whether it viewed Buck's position of trust in terms of CHC or the government. But, "when the judgment of the district court is correct, this court may affirm for reasons not given by the district court and not advanced to it." *United States v. Giraldo*, 111 F.3d 21, 24 n.12 (5th Cir. 1997).

[19] Rule 404(b) allows the admission of evidence of other crimes for several purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]"

[20] *See United States v. Pinnick*, 47 F.3d 434, 438 (D.C. Cir. 1995) (comparing the broad reach of the Guidelines for fraud to that for "most offenses, [where] the Guidelines require the sentencing court to consider only conduct intrinsic to the offense of conviction in determining the defendant's guideline range.").

common accomplices, common purpose, or similar *modus operandi*." § 1B1.3, cmt. n.9(A) (emphasis added).

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

§ 1B1.3, cmt. n.9(B).

It does not matter that Buck was never charged with the misapplication of DLWTW grant funds. The "Background" portion of § 1B1.3 specifically advises that

> the applicability of subsection (a)(2) does not depend upon whether multiple counts are alleged. Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction.

With both the DLWTW and Americorps frauds, Buck used MACE to defraud the government out of social services funds; with both, she certified that she would abide or had abided by the various requirements of the programs. Buck used the funds acquired by both frauds to pay for numerous activities relating to the operation of MACE, rather than for the limited purposes for which the grants were specified.

Both frauds therefore shared a common purpose: to prop up the cash-strapped MACE. The common victim, common purpose, and similar *modus operandi* paired the two frauds in a common scheme. The two crimes are distinguished by obvious differences, but the evidence does not so differentiate them to render the district court's ruling clearly erroneous.

V.

Buck argues that the $11,580.96 that went to the mayor of Metcalfe under the AmeriCorps grant should have been deducted from the loss amount, because Allen's involvement in several community service projects "went toward the ultimate goals of the program." We review the inclusion of these funds for clear error. *United States v. Kimbrough*, 69 F.3d 723, 733 (5th Cir. 1995).

Buck's argument is meritless. AmeriCorps funds may not be used to fund programs that already exist. *See* 45 C.F.R. § 2540.100(e) (2001). Allen testified that all the programs in question were already in existence before she began receiving AmeriCorps grants, that they had independent funding, and that her involvement was limited.

The jury credited this testimony, finding that Buck had misappropriated funds, because Allen was not authorized to receive grants un-

der the AmeriCorps program. The district court did not err in considering the loss of those unauthorized grants at sentencing.

## VI.

Buck maintains that the district court erred by not granting a downward departure on numerous grounds offered at sentencing, including her lack of pecuniary gain from the offenses, the obstacles of poverty and prejudice she had overcome, and her charitable and public service work. We have jurisdiction to review the district court's refusal to grant a downward departure from the Guidelines only if the refusal was based on an error of law. *United States v. Palmer*, 122 F.3d 215, 222 (5th Cir. 1997).

> Thus, we have jurisdiction if a district court's refusal to depart downward is premised upon the court's mistaken conclusion that the Guidelines do not permit such departure, but we have no jurisdiction if the court's refusal is based on its determination that departure is not warranted on the facts of the case. A defendant's mere dissatisfaction with the trial court's refusal to depart downward forms no basis for an appeal.

*Id.* (citation omitted). Even where jurisdiction is found, "the appellate court rarely should review *de novo* a decision to depart from the Sentencing Guidelines, but instead should ask whether the sentencing court abused its discretion." *United States v. Walters*, 87 F.3d 663, 672 n.10 (5th Cir. 1996).

The district court could grant a downward departure under U.S.S.G. § 5K2.0 if it found "there exist[ed] an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sen-

tencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1996). The sentencing court must consider a factor in its given circumstances and "decide whether it is sufficient to take the case out of the Guideline's heartland." *Koon v. United States*, 518 U.S. 81, 96 (1996).

Buck urges that the district court was unaware that it could depart and that we should remand because of the district court's mistake of law. The court, however, displayed a firm understanding of the law. Indeed, it had recently read *Koon* and *Walters*, as well as other cases and the applicable portions of the guidelines, and recited in detail the standards it was to apply.

A careful reading of the sentencing hearing indicates that the court considered every one of Buck's points but reluctantly decided they did not rise to the level necessary to justify a departure. The court did not believe it was *unable* to make a downward departure under the law, but rather concluded that Buck's arguments did not merit such a departure.

For example, with respect to Buck's contention that a downward departure was appropriate because she did not experience pecuniary gain and therefore the loss calculation "overstates the seriousness of the particular defendant's conduct," the court reviewed *Walters*, in which we upheld a six-month downward departure where the defendant received no personal benefit and the lower court determined that the "guideline calculation overstates the seriousness of [Walter's] involvement." *Walters*, 87 F.3d at 672. The victim, a Louisiana parish, had been unaware of illegal fees included in its insurance payments, but ultimately received insurance at the price it had negotiated. *Id.* at 668.

11

The district court determined that the government did not get the benefit of AmeriCorps volunteers as it had been led to believe, and potential AmeriCorps volunteers were denied grants as a result of Buck's fraud. Therefore, in the district court's judgment, despite the lack of direct pecuniary gain by Buck,[21] "[t]he seriousness of the offense has not been overstated by either the sentencing guidelines or the presentence investigation report."

The district court made similar determinations in weighing each of Buck's arguments for a downward departure. Because the court understood its authority and declined to depart, we are without jurisdiction to review its determinations. This portion of Buck's appeal is dismissed.

We therefore AFFIRM Buck's conviction and sentence on all issues except the district court's denial of a downward departure under § 5K2.0, as to which issue we DISMISS the appeal for want of jurisdiction.

_____

[21] It is also questionable to assert that Buck did not benefit pecuniarily when the fraud helped keep afloat the struggling nonprofit of which she was CEO and President. Presumably she paid herself a salary that would have disappeared had MACE failed.