[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-12838

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 22, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-00333-CR-T-30-MAP

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

STEPHEN BRACCIALE,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 22, 2004)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and EDENFIELD[*],
District Judge.

HULL, Circuit Judge:

_____

[*]Honorable B. Avant Edenfield, United States District Judge for the Southern District of
Georgia, sitting by designation.

After pleading guilty, Stephen Bracciale appeals his 15-month prison sentence for wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2. Bracciale argues that the district court erred: (1) in its loss calculations under sentencing guideline § 2F1.1; and (2) in imposing the abuse-of-trust enhancement pursuant to guideline § 3B1.3. U.S.S.G. §§ 2F1.1 & 3B1.3 (1995).[1] After review and oral argument, we reverse the loss calculation and affirm the abuse-of-trust enhancement.

## I. BACKGROUND

**A.     Facts**

From 1974 to 1997, Defendant Bracciale was employed by Kraft Foods ("Kraft"). Bracciale held sales positions, ultimately advancing to the position of Regional Sales Manager at Kraft.

In the course of its normal business, Kraft offers discounted prices to certain customers in exchange for various promotional and advertising activities ("promotional activities"). From 1994 to 1997, Kraft offered three kinds of deals to customers: (1) "Merchandise" discounts, whereby the customer received a discounted price in exchange for negotiated promotional activity; (2) "Purchase

---

[1] All citations to the sentencing guidelines herein are to the 1995 version, unless otherwise noted.

Only" discounts, whereby the customer received a discounted price in exchange for merely purchasing the food product; and (3) "Purchase and Merchandise" discounts, whereby the customer received a discounted price in exchange for purchasing the food product and agreeing to certain promotional activity. Kraft permitted only certain authorized customers to participate in its discount programs.

Under these discount programs, authorized customers would purchase Kraft food products at full price. The customer, however, would receive money back from Kraft by submitting Deal Payment Authorization ("DPA") forms to Kraft. The DPA forms required Kraft to reimburse the customer for the difference between the full purchase price and the previously negotiated discount price. This process was known as "bill-backs."

A Kraft senior executive, such as Bracciale, would then approve the bill-back and pay the customer the required amount. Where the sale included a "Merchandise" or "Purchase and Merchandise" discount, the customer was obligated to use some of the bill-back money to market Kraft's products. For example, bill-back money could be used to erect Kraft displays or to provide new product sampling in grocery stores.

During his employment with Kraft, Defendant Bracciale met David Weinbaum, who operated D&K, a company which supplied food products to smaller food stores and other retail establishments. D&K was not authorized to receive discounted food prices under any of Kraft's three discount programs. However, due to his acquaintance with Weinbaum, Bracciale arranged for D&K to obtain Kraft goods at the discounted prices offered to an authorized customer, McLane Company, Inc. ("McLane"). Bracciale encouraged McLane to divert to D&K some of the food products that it had bought from Kraft at a discounted price. This allowed D&K to purchase those products at McLane's discounted price, a price much lower than that which D&K would have paid for the products on the open market.

Bracciale and Weinbaum shared the profits that D&K enjoyed as a result of this diversion scheme. Kraft's internal policy, however, barred Bracciale from (1) self-dealing or making arrangements with its customers to profit personally from Kraft sales, and (2) participating in the diversion of Kraft products.

**B.    Information and Plea Agreement**

On September 10, 2001, Defendant Bracciale was charged by information with one count of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2.[2] Section 1343 makes it a federal crime to devise

> any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343. Further, § 1346 states that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In its information, the government alleged that from 1994 to 1997 Bracciale "did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Kraft Foods of money and property and the intangible right of his honest services by means of false and fraudulent pretenses, representations, and promises."

---

[2] 18 U.S.C. § 2 states:

Section 2. Principals

    (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

    (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

On September 18, 2002, pursuant to a written plea agreement, Bracciale

pled guilty to wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2.[3]   The

plea agreement specifically listed the elements of Bracciale's fraud offense as

follows:

|  |  |
|---|---|
| First: | That the Defendant knowingly devised or participated in a scheme to defraud, or for obtaining money or property by means of false pretenses, representations or promises; |
| Second: | That the defendant did so willfully with an intent to defraud; |
| Third: | That the Defendant transmitted or caused to be transmitted by means of wire communication in interstate commerce a writing and signal, for the purpose of executing the scheme to defraud; and |
| Fourth: | That the Defendant reasonably foresaw or should have foreseen that his breach of a fiduciary duty to his employer which [sic] might cause an economic harm to that employer. |

## C.    Loss Calculations Under § 2F1.1

After accepting Bracciale's plea, it was necessary for the district court to

determine Kraft's monetary loss in order to sentence Bracciale.   Under the 1995

Sentencing Guidelines, the base offense level for offenses involving fraud is six

and is increased up to eighteen levels based on the fraud victim's loss.  U.S.S.G.

§§ 2F1.1(a), (b)(1).  The Presentence Investigation Report ("PSI") concluded that

---

[3]This plea agreement followed an earlier plea agreement which was subsequently withdrawn.

Kraft's loss was $1,031,123.35 based on a memorandum by Kraft's Rick Gylling ("Gylling Memo"). The Gylling Memo's calculations were based on McLane's improper bill-backs to Kraft for products diverted to D&K. The Gylling Memo separates the improper bill-backs into the three discount programs, and lists them as follows: (1) for Kraft's "Purchase and Merchandise" program, $723,006.61; (2) for Kraft's "Merchandise" program, $308,116.74; and (3) for Kraft's "Purchase Only" program, $494,207.05. According to the Gylling Memo, the documentary evidence "shows that $723,006.61 (Purchase and Merchandise) plus $308,116.74 (Merchandise) were unearned by Bracciale since the funding was used to finance the diverting of the product." Thus, according to the Gylling Memo, the "total amount of $1,031,123.35 represents the injury to Kraft since the funds were provided to secure specific merchandising from McLane[-]supplied retailers that was never received."

The district court rejected the PSI's loss calculations of $1,031,123.35. Instead, the district court used the $733,211.86 monetary gain realized by Bracciale and Weinbaum as a substitute for Kraft's monetary loss. In opting for the gain amount, the district court determined that Kraft's actual monetary loss was too difficult to define and that the profit to Bracciale and Weinbaum was a more specific and reliable figure.

**D.     Abuse-of-Trust Enhancement Under § 3B1.3**

Over Bracciale's objection, the district court also applied a two-level abuse-of-trust enhancement.  Defendant Bracciale argued that the enhancement resulted in impermissible double counting because his wire fraud conduct was the same conduct used for the abuse-of-trust enhancement.  Bracciale also stressed that breach of fiduciary duty was an element of his wire fraud offense and again that breach of fiduciary duty and "abuse of trust" were the same conduct.

Rejecting Bracciale's contentions, the district court determined that an abuse-of-trust enhancement was warranted "because Mr. Bracciale's position aided him in committing this offense and in setting up this scheme.  He wasn't supervised closely, and it was all because of the trust afforded him in his position that allowed this scheme to flourish."[4]  Bracciale appeals his 15-month prison sentence.

## II.  LOSS CALCULATIONS

---

[4]The district court also ordered that Bracciale pay a $5,000 fine and pay Kraft restitution of $420,137.90.  In addition to the abuse-of-trust enhancement, the district court added two levels for more than minimal planning under § 2F1.1(b)(2)(A), but then decreased three levels for acceptance of responsibility under § 3E1.1.  The district court also departed two levels downward for diminished capacity due to Bracciale's bipolar disorder under § 5K2.13, and two levels for overstatement of the seriousness of the offense, pursuant to application note ten under § 2F1.1. The parties did not appeal these determinations.

The first issue on appeal is whether the district court erred in using Bracciale and Weinbaum's gain as a substitute for Kraft's loss for the purpose of sentencing Bracciale under § 2F1.1.[5]

## A. U.S.S.G. § 2F1.1

Section 2F1.1 assigns a base offense level of six to a wide variety of fraud crimes. See U.S.S.G. § 2F1.1(a) & cmt. background. Under the 1995 Sentencing Guidelines, the base offense level of six is increased based on the amount of the loss occasioned by the fraud. U.S.S.G. §§ 2F1.1(a), (b)(1). Thus, "'loss' under § 2F1.1(b) is a specific offense characteristic intended to measure the actual, attempted, or intended harm of the offense." United States v. Orton, 73 F.3d 331, 333 (11th Cir. 1996). The measure of harm generally focuses on the "victim's direct loss," see United States v. Wilson, 993 F.2d 214, 217 (11th Cir. 1993), such as "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, cmt. n.7.

"For purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, cmt. n.8; see United States v. Renick,

---

[5]"We review the application and interpretation of the Sentencing Guidelines de novo, and we review findings of fact for clear error." United States v. Snyder, 291 F.3d 1291, 1295 (11th Cir. 2002).

273 F.3d 1009, 1025 (11th Cir. 2001); Orton, 73 F.3d at 335 (quoting § 2F1.1, cmt. n.8).  At the same time, the district court cannot merely "speculate" as to the proper amount of loss.  See United States v. Supelveda, 115 F.3d 882, 890 (11th Cir. 1997).  "Upon challenge, however, the government bears the burden of supporting its loss calculation with 'reliable and specific evidence.'"  Renick, 273 F.3d at 1025 (quoting Supelveda, 115 F.3d at 890).  Further, under § 2F1.1(b)(1), "substitution of defendants' gain is not the preferred method because it ordinarily underestimates the loss."  United States v. Snyder, 291 F.3d 1291, 1295 (11th Cir. 2002); see also Orton, 73 F.3d at 334.

While "the 'loss to losing victim' approach is not required in every case," the district court should not abandon a loss calculation in favor of a gain amount where "a reasonable estimate of the victims' loss based on existing information is feasible."  Snyder, 291 F.3d at 1296 (citing Orton, 73 F.3d at 334).[6]

---

[6]See United States v. Yeager, 331 F.3d 1216, 1226 (11th Cir. 2003) (noting that district court was unable to reasonably estimate the loss due to the conflicting and confusing accounts at trial by experts and affirming district court's finding that the amount of profit obtained by the defendant was a reasonable estimate of the loss inflicted by his fraudulent conduct).  Unlike Yeager, in this case a reasonable estimate of loss is available from the Gylling Memo without resorting to the gain amount and is thus appropriate to use.  Further, in Yeager, the defendant's fraud allowed his company, Respiratory Distributors, Inc., to make a profit on sales of products he purchased from the victim BIPI, and under the particular facts of that case the profit the defendant's company made correlated to the profit the victim BIPI could have made but for the defendant's fraud.  See id. at 1225-26.  In contrast, in this case the defendant's gain does not so correlate with Kraft's loss.  Instead, the defendant's fraud caused the victim Kraft to pay certain bill-backs and Kraft's loss can be reasonably estimated by the amount of bill-backs Kraft paid, as outlined in the Gylling Memo.

**B.      Kraft's Loss**

Stating that the exact amount of Kraft's loss was "difficult to define," the district court used Bracciale and Weinbaum's monetary gain as a substitute for Kraft's loss under § 2F1.1(b)(1).  However, we conclude that the district court erred because a reasonable estimate of Kraft's loss based on existing information was feasible in this case.

In Snyder, this Court reversed a district court's loss calculation based on the defendants' gain.   291 F.3d at 1296.  Prior to sentencing, the government obtained an estimated victim loss calculation from an accounting report prepared by a CPA at the direction of the U.S. Attorney's Office.  Id. at 1295.  Despite this, the district court found that "a reasonable estimate of the victims' loss was not feasible" because "[i]t would require significant expenditures of time and resources to determine the large amount of detailed information and no such information [was] before [the] Court."  Id.  The district court thus "found, sua sponte, the better calculation of the victims' loss would be to use the intended or potential gain attributable to the defendants."  Id.  This Court reversed, and concluded that the CPA's research suggested that "a reasonable estimate of the victims' loss based on existing information [was] feasible."  Id. at 1296.

11

Although the figures in the Gylling memo may not provide the "precise" loss suffered by Kraft, such precision is unnecessary under § 2F1.1. See id. at 1295-96. The loss amount in the Gylling Memo was based on the bill-backs received and paid by Kraft regarding food product that was improperly diverted from McLane to D&K. The Gylling Memo contained supporting documentation and was by no means "speculative." Rather, the Gylling Memo represented "a reasonable estimate of the victims' loss based on existing information," id., and the district court should have used the Gylling Memo as the basis for determining Kraft's monetary loss.

Therefore, we reverse and remand this case so that the district court may consider anew its loss calculations. Upon remand, we instruct that the district court use the Gylling Memo's "projected" loss figure of $1,031,123.35 as its starting point, but note that Bracciale remains entitled to challenge the individual bill-back numbers used in the Gylling Memo. The government is entitled to respond, and the district court shall then make fact findings as to the loss amount.

## III. ABUSE-OF-TRUST ENHANCEMENT

Defendant Bracciale also appeals the district court's two-level enhancement for abuse of a position of private trust under U.S.S.G. § 3B1.3. Section 3B1.3 provides for a two-level enhancement where "a defendant abused a position of

public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. There is no dispute that Bracciale occupied a position of private trust at Kraft and that his position of private trust significantly facilitated the commission of the offense. Therefore, Bracciale's conduct is covered by § 3B1.1.

This does not end the inquiry because § 3B1.3 also states that "[t]his adjustment may not be employed if an abuse of trust . . . is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3 (emphasis added). Therefore, if either Bracciale's base offense level or specific offense characteristics already took into account Bracciale's abuse of trust, then the district court improperly applied § 3B1.3. If, however, Bracciale's base offense level or specific characteristics did not take into account Bracciale's abuse of trust, then the district court correctly applied § 3B1.3. We thus address Bracciale's specific offense characteristics and then his base offense level.[7]

A.      **Specific Offense Characteristics**

---

[7]"While the district court's factual determination that a defendant abused a position of [private] trust is reviewed for clear error, its conclusion that the defendant's conduct justifies the abuse-of-trust enhancement is a question of law that we review de novo." United States v. Garrison, 133 F.3d 831, 837 (11th Cir. 1998).

As for Bracciale's specific offense characteristics, ten levels were added because Kraft's "loss" was over $500,000, and two levels were added because Bracciale's offense involved more than minimal planning. The fact that Kraft's loss was more than $500,000 in no way accounts for Bracciale's abuse of trust. Rather, the ten-level enhancement is determined solely by the amount of loss and would apply equally to a senior executive or temporary mail room employee whose fraud resulted in a loss of more than $500,000.

Likewise, Bracciale's two-level enhancement for more than minimal planning does not take into account his abuse of trust. The fact that his scheme was complex and warranted a two-level enhancement is irrelevant to the analysis under § 3B1.3 because the minimal-planning enhancement would be applied regardless of Bracciale's position at Kraft. Thus, Bracciale's abuse of trust was not included in his specific offense characteristics.

## B.    Base Offense Level

We turn to whether Bracciale's abuse of trust is included in his base offense level of six under § 2F1.1(a). As noted earlier, § 2F1.1(a) assigns a base offense level of six to a wide variety of crimes, including fraud, deceit, forgery, and some counterfeiting offenses. U.S.S.G. § 2F1.1(a). Bracciale's base offense level of six is not dependent on any abuse of trust or breach of fiduciary duty; rather, he was

14

sentenced under § 2F1.1(a) because his underlying offense is a form of fraud.  In

fact, any defendant committing one of the numerous types of fraud listed  under §

2F1.1(a) receives a base offense level of six irrespective of whether any abuse of

trust or breach of fiduciary duty was involved in the commission of his fraud

offense.[8]  Therefore, we conclude that Bracciale's base offense of six does not

include or take into account his abuse of his position of private trust.

We recognize that Bracciale's plea agreement listed breach of fiduciary duty

as an element of his underlying fraud offense.[9]  As observed above, however, the

base offense level of six in § 2F1.1 is for various forms of fraud and is not

dependent on how the defendant committed the fraud or the elements of the

---

[8]Section 2F1.1(a) is entitled "Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."  The commentary to § 2F1.1(a) lists offenses under 18 U.S.C. § 1341-44 as subject to § 2F1.1(a). U.S.S.G. § 2F1.1, cmt.  18 U.S.C. § 1343 makes it a crime to devise a scheme or artifice to defraud and § 1346, entitled "Definition of 'scheme or artifice to defraud,'" states that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. §§ 1343, 1346.

[9]On appeal, the government asserts that Bracciale's breach of honest services under § 1346 does not necessarily involve a breach of fiduciary duty in private sector § 1346 cases.  See United States v. Devegter, 198 F.3d 1324, 1329-30 (11th Cir. 1999) (stating that "a private sector violation of § 1346 honest services fraud involves a breach of fiduciary duty and reasonably foreseeable economic harm," but ultimately concluding that the Court "need not decide . . . whether a fiduciary duty is necessary in private sector § 1346 cases").  Nonetheless, given how the government prosecuted this particular § 1346 case against Bracciale in the district court, we treat breach of fiduciary duty as an element of Bracciale's offense in this particular case. Nothing herein should be considered as ruling on the issue left unanswered in Devegter.  We also assume, solely for the purposes of this appeal, that conduct that breaches a fiduciary duty also constitutes an abuse of a position of private trust – Bracciale contends this is so, and the government does not dispute this contention on appeal.

15

particular fraud crime involved. For <u>sentencing guideline purposes</u>, Bracciale's

abuse of his position of trust or breach of his fiduciary duty is captured only by the

abuse-of-trust enhancement.[10] Thus, the district court did not err in applying the

abuse-of-trust enhancement.

**C.     Commentary to § 3B1.3**

Our conclusion is consistent with the commentary to § 3B1.3. The

commentary to § 3B1.3 states that the "adjustment, for example, would apply in

the case of . . . <u>a bank executive's fraudulent loan scheme</u>." U.S.S.G. § 3B1.3,

cmt. n.1 (emphasis added). The commentary also states that the adjustment should

"not apply in the case of an embezzlement or theft by an ordinary bank teller." <u>Id</u>.

For example, a bank executive and bank teller engage in two separate, but

identical fraudulent wire transfers. Although the government must prove the same

underlying elements of the offense for both, the commentary to § 3B1.3 mandates

that only the bank executive is eligible for the enhancement. This has nothing to

do with the elements of their respective offenses, but rather it is based on the roles

_____

[10]We note that there is a separate guideline for § 1343-46 fraud that is committed by public officials, as opposed to private parties such as Bracciale. <u>See</u> § 2C1.7. Section 2C1.7(a) assigns a base offense level of ten and its commentary specifically states that the abuse-of-trust enhancement should not be applied. U.S.S.G. § 2C1.7(a) & cmt. n.4. This is further indication that the base offense level of six for fraud under § 2F1.1 does not capture the abuse of trust or otherwise § 2F1.1 likewise would state specifically that the abuse-of-trust enhancement should not be applied.

16

each individual has in the bank – one a position of trust and one not.  Therefore, the commentary to § 3B1.3 already draws a distinction between those who should receive the enhancement and those who should not without regard to the elements of the underlying fraud offense.  See United States v. Milligan, 958 F.2d 345, 347 (11th Cir. 1992) (applying the abuse-of-trust enhancement in an embezzlement case because the applicable guideline, § 2B1.1, covers all kinds of theft and therefore, "the only way that an embezzler receives any kind of enhancement for abuse of position of trust is through [§ 3B1.3]"); see also United States v. Smith, 231 F.3d 800, 819 (11th Cir. 2000) (providing that "[t]he fact that another defendant committed the same offense without use or abuse of the defendant's position [of trust] does not preclude application of the § 3B1.3 enhancement").

## D.     United States v. Garrison

We recognize that dicta in the Medicare fraud case of United States v. Garrison, 133 F.3d 831, 842-43 (11th Cir. 1998), may suggest a contrary result. However, as explained below, that dicta in Garrison was based on the Second Circuit's decision in United States v. Broderson, 67 F.3d 452 (2d Cir. 1995), from which the Second Circuit has now retreated.  Further, this Court's subsequent decision in another Medicare fraud case, United States v. Liss, 265 F.3d 1220 (11th Cir. 2001), affirmed the abuse-of-trust enhancement and did not mention

17

that Garrison dicta. Id. at 1229-30. To explain and straighten out the confusing developments after Garrison, we first discuss Garrison and then post-Garrison decisions.

The Garrison Court addressed the question of "whether the owner and chief executive officer of a home healthcare provider properly was accorded a two-level enhancement under U.S.S.G. § 3B1.3 for abusing a position of public trust by submitting falsified Medicare claims to a fiscal intermediary." 133 F.3d at 833. In answering this question, the Garrison Court concluded that the defendant Garrison was "not directly in a position of trust in relation to Medicare. While Medicare may have been the victim in this case, the section 3B1.3 enhancement is unavailable because Garrison did not occupy a sufficiently proximate position of trust relative to Medicare." Id. at 841. The Garrison Court expressly determined that the defendant Garrison was ineligible for an abuse-of-trust enhancement because she did not occupy a position of trust vis-a-vis the victim of the fraud. Id. at 842.

After making that holding, the Garrison Court indicated that a § 3B1.3 enhancement was inapplicable for another reason. The Court agreed with Garrison's argument that her offense conduct of perpetrating a fraud against Medicare via false cost reports was the same conduct being used as the basis for

18

the abuse-of-trust enhancement. Id. Specifically, the Garrison Court stated that "[s]ince Garrison's base fraud crime was the submission of false statements on cost reports submitted to Aetna for Medicare reimbursement, she cannot receive an enhancement for abuse of a position of public trust based on the same conduct under the specific terms of section 3B1.3." Id. at 843. Because the Court first held that Garrison was not in a position of trust and ineligible for the enhancement, this "same-conduct" analysis is dicta and, therefore, is not binding on this Court.[11] We also note that this Court, while citing Garrison on many occasions, has never cited the opinion for its "same-conduct" analysis, but instead has cited the case primarily for its conclusion that Garrison did not occupy a position of trust vis-a-vis the victim of the fraud. See, e.g., United States v. Hall, 349 F.3d 1320, 1324-26 (11th Cir. 2003); Liss, 265 F.3d at 1229; Smith, 231 F.3d at 819-20; United States v. Mills, 138 F.3d 928, 941 (11th Cir. 1998).

Further, Garrison relied on a Second Circuit decision in Broderson, for the proposition that "'[t]he conduct that is the basis of the conviction must be

---

[11]See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 379, 114 S. Ct. 1673, 1676 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend."); Browning v. AT&T Paradyne, 120 F.3d 222, 225 n.7 (11th Cir. 1997) ("'Since this statement was not part of any holding in the case, it is dicta and we are not bound by it.'" (citation omitted)); Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller, 957 F.2d 1575, 1578 (11th Cir. 1992) (explaining that dicta is "neither law of the case nor binding precedent"); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring) ("[D]icta in our opinions is not binding on anyone for any purpose.").

19

independently criminal . . . and not itself the abuse of trust.'" Garrison, 133 F.3d at 843 (quoting Broderson, 67 F.3d at 456). However, the Second Circuit has retreated from its conduct-based approach in Broderson. See United States v. Ntshona, 156 F.3d 318 (2d Cir. 1998) (refusing to read Broderson broadly, stating that "the abuse of trust need not be entirely unrelated to the commission of the base offense" and rejecting defendant's contention that, for her Medicare fraud offense, "an abuse of trust is the essence of the crime and therefore is already accounted for in the base level offense"); see also United States v. Hirsch, 239 F.3d 221, 228 (2d Cir. 2001) (affirming the abuse-of-trust enhancement for a broker / investment advisor guilty of mail fraud); United States v. Carrozzella, 105 F.3d 796, 800-01 (2d Cir. 1997) (providing that, despite the fact that a lawyer's accounts to a probate court were included in his base offense level for mail fraud, his fraud "seems to fit squarely within [§ 3B1.3]" because "[h]is position as a trustee in the probate court was characterized by precisely the type of discretion and consequent lack of supervision that commentary to the guideline sets out as the key feature of a position of trust").[12]

_____

[12]We note that the Second Circuit, in United States v. Jolly, 102 F.3d 46, 48 (2d Cir. 1996), discussed Broderson and observed that "if Broderson had accepted a bribe from a party with whom he was negotiating to sweeten the terms of a deal with his employer, Broderson would have abused his position of trust vis-a-vis his employer." Such a scenario, which the Jolly Court deemed to be an abuse of trust, is closely analogous to Bracciale's profiting personally from the diversion of Kraft products.

Likewise, the Fifth Circuit, in United States v. Buck, 324 F.3d 786 (5th Cir. 2003), concluded that Broderson has been "limited to its facts" by the Second Circuit. Id. at 793. The Fifth Circuit upheld "the abuse of trust enhancement to a fraud sentence where the defendant employed discretionary authority given by her position in a manner that facilitated or concealed the fraud." Id. In Buck, the Fifth Circuit also rejected the defendant's contention that Garrison made abuse-of-trust enhancements unavailable in fraud convictions and noted that the Eleventh Circuit in United States v. Liss, 265 F.3d 1220, 1229 (11th Cir. 2001), had cited Garrison (Medicare fraud) when affirming an abuse-of-trust enhancement for doctors who committed Medicare fraud. Buck, 324 F.3d at 793 n.13.[13]

In Liss, a jury found two doctors guilty of conspiracy to defraud the United States and of receiving remuneration in return for Medicare referrals. 265 F.3d at 1225. The conduct at the heart of these crimes was the doctors' accepting kickbacks in return for referring patients to a Florida laboratory. Id. at 1224. It was this same conduct, accepting illegal compensation for Medicare referrals, that

---

[13]Specifically, the Fifth Circuit in Buck stated:
The other case relied on by [defendant] Buck, United States v. Garrison, 133 F.3d 831, 843 (11th Cir. 1998), also fails to support her argument that the abuse of trust enhancement is unavailable for fraud convictions. In fact, the Eleventh Circuit has cited Garrison in affirming an abuse of trust enhancement to a fraud sentence. See United States v. Liss, 265 F.3d 1220, 1229-30 (11th Cir. 2001).
324 F.3d at 793 n.13.

served as the basis for the district court's adding two levels for abuse of trust to the defendants' sentences. Id. at 1225. However, the Liss Court upheld the abuse-of-trust enhancement, citing Garrison for its "position of trust" analysis, while not mentioning at all the "same-conduct" dicta in Garrison. Id. at 1229; see also United States v. Linville, 228 F.3d 1330, 1331-32 (11th Cir. 2000) (affirming abuse-of-trust enhancement in a bank fraud case in a post-Garrison decision).

For the foregoing reasons, we determine that Garrison's conduct-based approach is dicta, was not mentioned (and thus not followed) in Liss, and is not binding in this case.

**D.     Double Counting**

Our conclusion that the elements of Bracciale's underlying offense do not control whether he is eligible to receive an abuse-of-trust enhancement is further supported by this Circuit's case law concerning impermissible double counting.

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999) (internal quotations and citation omitted). Double counting is permissible, however, when (1) "the Sentencing Commission intended the result," and (2) each

guideline section in question "concerns conceptually separate notions related to sentencing." Id. at 1310 (internal quotations and citation omitted). This Court presumes that, unless specifically directed otherwise, the Sentencing Commission intended that separate guidelines sections be applied cumulatively. Id.

In United States v. Naves, 252 F.3d 1166, 1168 (11th Cir.2001), this Court addressed a situation in which a defendant was convicted of carjacking in violation of 18 U.S.C. § 2119(1). As noted in Naves, carjacking crimes are to be sentenced under § 2B3.1. See id.; U.S.S.G. § 2B3.1, cmt. statutory provisions.[14] Section 2B3.1 provides a base offense level of twenty that applies not only to carjacking but also to robberies in general. See U.S.S.G. § 2B3.1(a). To that base offense level of twenty, the district court added a two-level enhancement because the offense involved carjacking as provided in U.S.S.G. § 2B3.1(b)(5). Naves, 252 F.3d at 1168. The defendant Naves contended "that the base offense level fully accounted for the level of culpability attributed to the offense of carjacking and that therefore adding two levels because 'the offense involved carjacking' constitutes impermissible 'double counting.'" Id.

---

[14]We note that the defendant in Naves was sentenced under the 1998 guidelines, as opposed to the 1995 version applicable here.

In Naves, this Court concluded that the two-level enhancement for carjacking did not constitute impermissible double counting. Id. at 1169. In so doing, the Naves Court stated that "[w]e must assume that the Sentencing Commission knew that the two point enhancement at issue herein would be imposed in every case involving a conviction under § 2119 [carjacking], that it intended this result, and that in effect it was creating a base level of 22 for a conviction under § 2119." Id. at 1168-69. In fact, "[t]he Sentencing Commission is authorized to provide such an enhancement as long as there is a rational relationship between the enhancement and a legitimate governmental objective." Id. at 1169. In Naves, an element of the underlying offense – carjacking – was not captured in the general robbery guideline that established the base offense level of twenty for carjacking crimes. See id. at 1168-69. Likewise in this case, the breach of fiduciary duty element of Bracciale's wire fraud was not captured in the fraud guideline that established a base offense level of six for a variety of fraud crimes but was captured only in the abuse-of-trust enhancement.

Similarly, in United States v. Phillips, 363 F.3d 1167 (11th Cir. 2004), this Court addressed a situation where the element of the crime was also the proper subject of a separate enhancement. In Phillips, a defendant, who was convicted of failing to pay court-ordered child support, received a two-level enhancement

24

because his offense of conviction involved "'a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines.'" 363 F.3d at 1168 (quoting U.S.S.G. §§ 2B1.1(a) & (b)(7)(C)). Obviously, the government was required to prove that Phillips had a legal obligation to pay child support, or he could not have been found in violation of 18 U.S.C. § 228(a)(3). Therefore, an element of the offense was also used to enhance his base offense level. In so concluding, this Court stated that

> [T]he Sentencing Commission could have created a separate guideline for willful failure to pay child support with a base offense of eight. The fact that the Sentencing Commission elected not to draft a separate guideline does not render the application of the two-level enhancement under § 2B1.1(b)(7)(C) irrational. Rather, it is rational for the Sentencing Commission to use § 2B1.1 to establish a base offense level of six for the culpability incident to offenses involving larceny, embezzlement, and other forms of theft.

Id. at 1169. As noted in Naves and Phillips, the Sentencing Commission could have created a different guideline taking into account Bracciale's abuse of trust and could have assigned that guideline a base offense level of eight. Rather, it is rational for the Sentencing Commission to use § 2F1.1 to establish a base offense level of six for a variety of fraud crimes, and to allow the abuse-of-trust enhancement to apply in cases like Bracciale's. The fact that the Sentencing Commission elected not to establish a separate guideline for Bracciale's specific

25

crime does not render the application of § 3B1.3 to Bracciale irrational or result in impermissible double counting.

## IV. CONCLUSION

For all the above reasons, we affirm the district court's application of the abuse-of-trust enhancement in § 3B1.3. However, we vacate Bracciale's sentence and remand this case for re-sentencing so that the district court may consider anew the loss amount under section §2F1.1.[15]

**AFFIRMED in part; REVERSED AND REMANDED in part.**

---

[15]Because we vacate Bracciale's sentence, the district court on remand also may reconsider its various other sentencing decisions. See, e.g., United States v. Le, 256 F.3d 1229, 1241 n.12 (11th Cir. 2001) (providing that, because Le's sentence was vacated, the district court on remand was allowed to reconsider any aspects of Le's sentence); United States v. Alvarez, 115 F.3d 839, 843 (11th Cir. 1997) ("Because we vacate Alvarez's sentence, the district court is free on remand to reconsider Alvarez's sentence in its entirety.").