**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**November 1, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

No. 02-21017

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JOE BOB MONCRIEF,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
No. H-00-544

Before BARKSDALE and PICKERING, Circuit Judges, and LYNN,[*] District Judge.

PER CURIAM:[**]

This appeal of the conviction of the appellant Joe Bob Moncrief involves what the government claims is the largest mortgage-loan-fraud operation ever to be prosecuted. No fewer than twenty-three individuals have been prosecuted in connection with this scheme. The indictment at issue here was brought against seven named defendants in addition to Moncrief. The indictment charged all eight defendants with violations of federal law in twenty-one counts. By May 2001, the seven other

---

[*] District Judge of the Northern District of Texas, sitting by designation.

[**] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

indicted defendants had pleaded guilty to at least one of the charged offenses. Moncrief, however, denied guilt and proceeded to trial.

The trial was conducted from August 15 to August 29, 2001. Twenty-six witnesses presented testimony, including several members of the conspiracy, a government investigator, realtors, and loan agents. Moncrief testified in his own defense. Trial testimony described a broad conspiracy centering on four members of the Mei family: Kevin Mei, Frank Mei, Jr., Daniel Mei, and Frank Mei, Sr.

## I.     *Background*

### A.     *Mei Enterprises and the Straw Buyer Bank Fraud Scam*

The Meis were the owners of Mei Enterprises, a conglomeration of several businesses operated by members of the Mei family. Mei Enterprises included a construction company operated by Frank Mei, Sr. In addition, Kevin and Frank Mei, Jr., operated several real estate companies. These companies included Hathaway Properties, Inc., Ashridge Enterprises, Inc., Bernard Management Corporation, Inc., Culburn Investments, and others. The companies had separate bank accounts and were operated by either Kevin, Daniel, or Frank Mei, Jr., although the corporate office served by each sibling differed from one company to another. Mei Enterprises also included Phillip Durbin, Jeff Mangold, Daniel Mei, Maura Slagel, and James Long, who were mortgage brokers operating under the names Foresight Mortgage, Innovative Residential Funding, Advanced Residential Funding, Flynn Mortgage and others. Mei Enterprises operated out of a common office.

In 1996, Kevin and Frank Mei, Jr., began the bank fraud scheme that evolved into the subject of the instant indictment. The object of the scheme was to accumulate large amounts of cash by inducing mortgage lenders to provide the Meis with loans that were $50,000 to $80,000 in excess of what it cost the Meis to purchase the real estate that served as the collateral for the loan. To

2

obtain those inflated loans, the Meis orchestrated sham real estate transactions in which the Meis would appear to sell a particular property, which coincided with actual sales in which the Meis would purchase, for the first time, the very same property.[1] The Meis would dupe the lender into believing that the loan was for the sham transaction with its inflated price, when in reality the Meis used the loan to purchase the property at a much lower price in a separate transaction. The Meis used the loan proceeds to pay for the entire real estate purchase and all closing costs associated with the sale. Then they simply kept the $30,000 to $50,000 in loan proceeds that were left over after the purchase was completed and expenses paid. In this way, the Meis accumulated large sums of money.

The scheme worked as follows: The Meis would locate a property for sale, either by themselves or through a referral from a "locator" to whom the Meis would pay a finder's fee when the transaction was completed. Once a suitable property was identified, the Meis, acting through one of their realty companies such as Hathaway Properties, would contract to purchase the property from its owner. The Meis then would identify someone to serve as the straw buyer for a parallel sham transaction that would be used to obtain an inflated loan. In many of the Meis' transactions, family members such as Frank, Sr., served as the straw buyer. Later, as the Meis exhausted the credit-worthiness of their original group of straw buyers, additional straw buyers had to be recruited.

The contract for the sham transaction – that is, the one between one of the Mei realty companies and the straw buyer – would list a purchase price tens of thousands of dollars greater than the purchase price between the Mei realty company and the original seller.[2] The Meis, acting through

---

[1]     At trial, witnesses referred to these as "flip transactions."

[2]  At trial, the Meis referred to the sham transaction as the "loan side" of the transaction. The transaction between the original seller and the Mei realty company was referred to as the "cash side" of the transaction. Because these terms are unilluminating as to the nature of what they describe, we avoid their use here.

3

one of their mortgage companies such as Foresight Mortgage, would apply for a mortgage loan ostensibly to fund the straw buyer's purchase of the property from the Mei realty company. Because the purchase price of the sham transaction was inflated by several thousand dollars, the amount of the loan always exceeded the purchase price of the real transaction between the original seller and the Mei realty company.

To secure a loan of the desired size, the Meis had to deceive the lender as to several matters. First, the lender had to believe that the Mei realty company already owned the home before they actually did. Thus, the Meis needed a counterfeit commitment of title, and they had to prevent the lender from learning of the transaction through which the Meis actually would acquire the property, which would occur only after the loan was disbursed. Second, the lender had to believe that the purchase price in the sham transaction was consistent with a reasonable market price. This required an appraisal that valued the realty at a much higher price than what the Meis would spend to purchase the property. Third, the Meis had to falsify the straw buyer's financial information to make the straw buyer appear more credit-worthy than he or she actually was. Fourth, the Meis had to ensure that no red flags were raised that would provoke the slightest additional inquiry from the lender. At the time the Meis were applying for the loan, the true sale price of the property often was a matter of public record. Consequently, any investigation by the lender easily could prevent the loan from being approved.

The Meis' mortgage brokers at Foresight Mortgage or the other affiliated companies were responsible for preparing the fraudulent loan packages. The loan packages consisted of the loan application form, the straw buyer's employment verification, pay stubs, W-2s, tax returns, bank statements, the sham purchase contract, a uniform residential appraisal report from a licensed

4

appraiser, and the counterfeit title commitment showing that the putative seller – the Mei realty company – had unencumbered title.

Once the loan was approved, the Meis arranged to close both sales – the real sale and the sham sale – on the same day. On closing day, the lender wired the loan amount to an escrow officer at the Meis' designated title company. The Meis often used the American Title Company where James Nguyen and Thomas Q. Nguyen,[3] who were allegedly members of the conspiracy, served as escrow officers. However, the Meis sometimes used other title companies where other escrow officers who allegedly were also members of the conspiracy were employed. When the loan proceeds were received by the title company, the escrow officers affiliated with the Meis immediately released the proceeds into a designated Mei bank account. Due to a special arrangement called force-pay debit that the Meis had with the bank, the Meis were able to access the loan proceeds immediately upon deposit. Using the loan proceeds, the Meis purchased two cashier's checks: One of the cashier's checks was payable in the amount of the straw buyer's down payment. The straw buyer was named as the payer of the check, and the title company was named as the payee. The second cashier's check was payable in the amount of the purchase price of the sale contract between the original seller and the Mei realty company. The check named the Mei realty company as the payer and the original seller as the payee. The checks were delivered to the title company, and with their payment, both transactions were complete. The original seller received his or her contract price, and the check for the down payment was placed in the title company's records to perpetuate the appearance that the straw buyer paid money down on the transaction. Eventually, however, the down

---

[3] The record indicates that at the time of this appeal, the prosecution of Thomas Q. Nguyen and James Q. Nguyen, who the United States also alleges were participants in the conspiracy at issue here, was still pending, under a separate indictment.

payment was disbursed back to the Meis, who recorded the money as "profit" from the transaction.

The Meis paid the straw buyers $5,000 per transaction. If a realtor referred the property to the Meis, the Meis paid the realtor a $3,000 finder's fee. They paid the appraiser $300 for the appraisal. Some amount also was paid to the title and the mortgage company. The Meis kept whatever money remained from the transaction. To offset the costs, the Meis rehabilitated the houses and rented them to tenants. The Meis made all the mortgage payments in the straw buyer's name.

**B.** *Moncrief Becomes Involved with the Meis*

Moncrief has held a realtor's license since 1980 and a real estate appraiser's license since 1992. He is also a licensed mortgage broker. He has worked in the past as both a realtor and an appraiser, although by 1997 he had stopped practicing as a realtor and instead was a full time residential appraiser.

Moncrief's first contact with the Meis occurred in December 1997 when he received two unsolicited faxes from Foresight Mortgage. At this point, before Moncrief had any involvement with the Meis, the Meis already had performed at least twenty-four straw buyer transactions that provided nearly $5.5 million in loan proceeds. The faxes that Moncrief received in December 1997 were generic solicitations to perform preliminary appraisals on selected properties. Moncrief responded to the faxes and began conducting appraisals for Foresight. Eventually, Moncrief learned that the properties that he was appraising for the Meis were being referred to the Meis by other realtors. In order to expand his business with the Meis, Moncrief began referring properties to the Meis as well as performing appraisals. However, the Meis rejected all but one of the properties that Moncrief

6

referred. Sometime around June 1998,[4] frustrated at receiving so many rejections, Moncrief asked Kevin Mei what the Meis' criteria for selecting property were. Frank Mei testified to this exchange as follows:

> And, you know, on the ones that we did, we'd say, "Okay. Go ahead and do the appraisal on it." So, Joe would actually do the appraisal. And then Joe kind of figured out, "Well, you know, I could find these too. I should be making the money these other people are making as well."
> . . . .
> He came in and said, "Well, there's got to be a method to your madness. There's got to be a reason why you're coming up with which properties you purchase and which properties you don't." And then we explained to him that method was a formula.

This was the formula: (house value x 80%) x .92) - list price $ $35,000. The 80% in the formula represented the standard amount that lenders would lend on a residential real estate purchase – that is, lenders generally would lend up to 80% of the cost of a home. Thus, for a property to meet the formula's criteria, it had to be the case that 92% of the amount that a lender would lend someone to purchase the house was at least $35,000 more than the property's current list price. Later on, the Meis increased the formula value from $35,000 to $50,000.

From the day that the Meis told Moncrief their formula, every property that Moncrief referred to the Meis *worked* under their formula. From June 1998 until January 2000, Moncrief prepared at least eighty appraisals that the Meis used in straw buyer transactions. Frank Mei estimated that Moncrief performed approximately 100 appraisals for the Meis on straw buyer transactions. Moncrief was involved in more straw buyer transactions than any other appraiser that the Meis used.

---

[4] The date of this exchange was not established with any specificity. Moncrief testified that it occurred late in the Summer of 1998. Agent Kepler testified that Moncrief received his first finder's fee on June 6, 1998, suggesting it may have occurred earlier.

The Meis paid Moncrief $300 for every appraisal he conducted. He received a $3,000 finder's fee for all properties where he made the initial referral to the Meis. Altogether, between June 6, 1998 and January 21, 2000, the Meis paid Moncrief at least $174,470 in finder's fees. Moncrief's frequent business with the Meis caused him to visit the Meis' office three or four times a week.

Six real estate transactions in which Moncrief provided an appraisal provide the basis for all the counts alleged in the indictment against Moncrief. To avoid repetition, we briefly summarize two such transactions.

### C. *Transactions Described in the Indictment*

#### 1. *1718 Park Ridge Drive*

On May 19, 1999, the Meis, acting through Ashridge Enterprises, closed sham and real transactions relating to the property located at 1718 Park Ridge Drive. In the real transaction, Ashridge Enterprises, by Daniel Mei, purchased 1718 Park Ridge Drive from its true owner for a purchase price of $142,000. The property at 1718 Park Ridge was sold through Joseph B. Rothchild, a real estate broker. On February 12, 1999, Rothchild listed the property on the Multiple Listing Service[5] ("MLS") at a sales price of $144,900.

On March 18, 1999, the Meis executed a commitment of title fraudulently indicating that Ashridge Properties held title to 1718 Park Ridge Drive. On March 22, 1999, Daniel Mei signed the purchase contract with the property's true owner to purchase the property for $142,000. On March 31, 1999, Moncrief executed an appraisal report valuing 1718 Park Ridge Drive at $290,000. Although Moncrief verified in the appraisal report that he conducted an MLS and tax record

---

[5] The Multiple Listing Service is a database of the published asking prices for listed properties. It discloses the existence of pending contracts and provides tax valuations. Trial testimony indicated that realtors regularly rely on the MLS in determining the value of real estate.

8

inspection, he did not list the MLS value of the house. Moncrief did not disclose that a realtor was involved in the sale. He falsely indicated that at the time of the appraisal, Ashridge Enterprises was the owner of the property. He did not disclose that he would receive a $3,000 finder's fee if the transaction closed.

On May 18, 1999, the Bank of Yorba Linda deposited the approved loan amount of $234,935.64 into American Title Company's escrow account. On May 19, 1999, James Nguyen disbursed the loan proceeds into Ashridge Enterprises' bank account. By force-pay debit, the Meis used the loan proceeds to purchase two cashier's checks: one in the amount of $60,198 in the name of John Garcia, the Meis' straw buyer, to pay the down payment in the sham transaction, and one in the amount of $141,369.75 in the name of Ashridge Enterprises to purchase 1718 Park Ridge Drive from its true owner.

This transaction formed the basis of count two of the indictment. Count two was for bank fraud. As charged in the indictment, the jury found that Moncrief committed bank fraud by submitting the appraisal report to Foresight Mortgage to be included in the loan application to the Bank of Yorba Linda.

### 2. 7950 Hertsfordshire Drive

On June 3, 1999, the Meis, acting through the Bernard Management Corporation, closed real and sham transactions relating to property located at 7950 Hertsfordshire Drive. In the real transaction, the Bernard Management Corporation purchased 7950 Hertsfordshire Drive from its true owner for a purchase price of $219,263.20. In the sham transaction, the Bernard Management Corporation sold 7950 Hertsfordshire Drive to John Garcia for a purchase price of $350,000. As part of the loan package submitted in relation to John Garcia's purchase of the property, Moncrief

9

provided an appraisal in which he valued the property at $350,000. The MLS listed 7950 Hertsfordshire Drive as having a purchase price of $220,000. In the appraisal, Moncrief also incorrectly reported that the Bernard Management Corporation held title to 7950 Hertsfordshire Drive. Moncrief also did not disclose that he would receive a $3,000 finder's fee if the transaction closed.

On June 13, 1999, First Franklin Financial deposited $333,447.20 by wire-transfer into the escrow account at the American Title Company. Nguyen, the escrow officer, immediately disbursed the proceeds into Bernard Management Corporation's account. On the same day, by force-pay debit, the Meis used the loan proceeds to purchase two cashier's checks: one in the name of John Garcia in the amount of $68,797.89 to serve as a down payment in the sham sale, and one in the name of the Bernard Management Corporation in the amount of $219,263.20 to purchase 7950 Hertsfordshire Drive from its true owner. The Meis paid Moncrief a finder's fee on this transaction.

This transaction formed the basis of counts ten, nineteen, and twenty of the indictment. Count ten was for illegal money transaction and counts nineteen and twenty were for money laundering. As charged in the indictment, the jury found that the money laundering occurred when the Meis used the loan proceeds to purchase the cashier's checks.

### D.     *Moncrief's Purchase of 8402 Braesdale*

In 1999, when Moncrief wanted to purchase a home, he made the purchase through the Meis' scheme. Moncrief selected the property he wanted to purchase, 8402 Braesdale, which was being sold by Camel Lee Girgis, and he asked the Meis to help arrange the purchase. On February 13, 1999, Hathaway Properties signed a contract with Girgis to purchase 8402 Braesdale for $147,500. Although Moncrief knew that Girgis was selling the property for $147,500, Moncrief signed a

10

contract to purchase the property from Hathaway for $215,000. Moncrief applied for a mortgage loan from EquiCredit to fund the purchase. In the loan application, Moncrief's cash assets were falsified to represent that he had $75,200 in his checking account when he actually only had $698.94. EquiCredit approved a loan to Moncrief in the amount of $149,261.

On June 18, 1999, EquiCredit deposited the loan proceeds with the American Title Company. On that date, James Nguyen disbursed the loan proceeds to Hathaway's bank account. By force pay debit, the Meis used the loan proceeds to purchase a check in the amount of $149,041.56 to purchase 8402 Braesdale from Girgis. The Meis purchased a second money order in the name of Moncrief in the amount of $58,007.31[6] to create the appearance that he paid a down payment in his purchase of the property in the sham transaction. Moncrief was present at the closing of the sale and signed all the forms necessary to complete the purchase.

Although Moncrief, not Hathaway, made the mortgage payments on this property, Frank Mei noted that by using the straw buyer set up, Moncrief obtained his house without making a down payment. Moncrief testified that he was unaware of the Meis' machinations with regard to the sale, that he did not read the closing documents, and was unaware of anything out of the ordinary about the forms he signed. He also claims that the Meis altered his financial information, to his benefit, without his permission or consent.

**E.** *The Investigation*

In 1997, Michael Kepler, a Senior Special Agent with the Department of Housing and Urban Development ("HUD"), received tips that led him to investigate Mei Enterprises for irregularities in

---

[6] The record does not reflect where this $58,007.31 came from as the loan was for only $149,261.00.

real estate transactions. In December 1998, the FBI executed a search warrant on the central office of Mei Enterprises in Houston. In February 1999, Special Agent Kepler questioned Moncrief about the appraisals he conducted for the Meis in the prior year. Kepler asked Moncrief about his methodology. Moncrief answered that he appraised the properties with reference to the MLS, tax records, and sales of comparable properties.

All of the transactions that are the subject of the indictment occurred after the FBI conducted a search of the Mei Enterprises offices and after Kepler conducted the interview with Moncrief on February 18, 1999. After February 18, 1999, Moncrief collected at least thirty-six additional finder's fees on straw buyer transaction with the Meis.

### F. *Moncrief's Conviction and Sentence*

On August 29, 2001, a jury convicted Moncrief of conspiracy in violation of 18 U.S.C. §§ 371 & 1956(h), of two counts of bank fraud in violation of 18 U.S.C. § 1344, of five counts of illegal money transactions in violation 18 U.S.C. § 1957(a), and of nine counts of money laundering in violation of 18 U.S.C. § 1956(a)(1). On August 23, 2002, the district court imposed a 210-month sentence. Moncrief now appeals.

## II. *Moncrief's Challenges to the Conviction*

### A. *Sufficiency of the Evidence as to Conspiracy Charge*

The first issue this court will address is Moncrief's challenge to the sufficiency of the evidence. Moncrief failed to properly preserve his right to review on this question. Although Moncrief moved for acquittal at the conclusion of the government's case, the parties agree that he failed to move for acquittal at the close of evidence, nor did he move for acquittal after the entry of the verdict within the time required under Federal Rule of Criminal Procedure 29(c)(1), which

12

requires that post-verdict motions for acquittal be filed within seven days of the verdict.[7]  *See* Fed. R. Crim. P. 29(c)(1).  Moncrief's failure to make a follow-up motion resulted in a waiver of his initial motion.  Based on Moncrief's failure to make a follow-up motion, Moncrief's appellate challenge of the sufficiency of the evidence supporting his conviction should be reviewed only to prevent a miscarriage of justice.[8]  *See United States v. Delgado*, 256 F.3d 264, 274 (5th Cir. 2001); *United States v. Pariente* 558 F.2d 1186, 1187 n.1 (5th Cir. 1977).

However, Moncrief argues that his counsel's failure to move for acquittal constituted ineffective assistance of counsel.  Citing *United States v. Rosalez-Orozco,* 8 F.3d 198, 199 (5th Cir. 1993), Moncrief argues that the court must evaluate the sufficiency of the evidence under the ordinary standard of review to determine whether that evaluation produces an outcome different than under a miscarriage of justice standard.[9]  Moncrief's ineffective assistance claim requires this court to determine (1) whether defense counsel's performance was objectively unreasonable and (2) whether the defendant has shown a reasonable probability that the result of the proceedings would have been different absent the attorney's errors.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Rosalez-Orozco,* 8 F.3d at 199.  Without analyzing whether the performance of Moncrief's counsel

---

[7]  On January 7, 2002, some four months after the entry of the verdict, Moncrief filed a letter with the court in which he asked the court to overturn the jury verdict.  Citing *United States v. Emuegbunam*, 268 F.3d. 377, 397 (6th Cir. 2001), Moncrief concedes that a court may not rule on an untimely motion for acquittal.

[8]  Under a miscarriage of justice standard of review, the conviction can be reversed only if "the record is devoid of evidence pointing to guilt or contains evidence on a key element of the offense [that is] so tenuous that a conviction would be shocking."  *United States v. Burton*, 324 F.3d 768, 770 (5th Cir. 2003).

[9]  Although claims of ineffective assistance are rare on direct appeal, such claims are reviewable if "the record is sufficiently developed."  *United States v. Freeze*, 707 F.2d 132, 138 (5th Cir. 1983).  Moncrief argues that the record is fully developed for the court to evaluate this claim.  He also notes that in the past the Fifth Circuit has found it appropriate to review on direct appeal ineffective assistance claims based on the failure to move for acquittal.  *See Rosalez-Orozco,* 8 F.3d at 199.

13

was objectively unreasonable, we conclude that Moncrief has failed to show prejudice because his conviction would be upheld under even the more lenient standard of review reserved for preserved challenges.

Under the ordinary standard of review that this court applies to preserved challenges to jury verdicts, the court must view "the evidence, any inferences to be drawn from the evidence, and any required credibility determinations in a light most favorable to the guilty verdict. The jury's verdict must be affirmed if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *United States v. Glasser*, 315 U.S. 60, 80 (1942). We conclude that the evidence amply supports affirmance under this standard.

To convict for conspiracy, the government must prove (1) an agreement between the defendant and a conspirator to violate a law of the United States; (2) an overt act by one conspirator in furtherance of the conspiracy; and (3) the specific intent to further an unlawful objective of the conspiracy. *See United States v. Bieganowksi*, 313 F.3d 264, 276-77 (5th Cir. 2002), *cert. denied*, 123 S.Ct. 1956 (2003). The government must show that "the defendant[s] knew of the conspiracy and . . . voluntarily became part of it." *United States v. Onyiego*, 286 F.3d 249, 254 (5th Cir. 2002). "Circumstantial evidence, such as a concert of action, may suffice, but each link in the inferential chain must be clearly proven." *Id.* at 255. Demonstration of the existence of an agreement is the "central element." *Bieganowksi*, 313 F.3d at 276. After that, "even minor participation in the conspiracy may serve as a basis for conviction." *Id.*

At trial, the Meis testified to the existence of the conspiracy, and Moncrief does not dispute that the conspiracy existed. Rather, Moncrief disputes whether the evidence demonstrated that he agreed to participate in the conspiracy.

14

Bank fraud is the knowing execution or attempted execution of a scheme or artifice to defraud a financial institution or to obtain any property owned by or under the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises. *See United States v. McCauley*, 253 F.3d 815, 819 (5th Cir. 2001). Here, the evidence shows that Moncrief knew of the Meis' conspiracy to commit bank fraud and that he voluntarily joined it.

Moncrief joined the Meis' conspiracy to commit bank fraud when the Meis told Moncrief their formula. The evidence shows that after he learned of the formula, Moncrief always referred properties that "worked" under the formula. When Moncrief performed appraisals in relation to one of the Meis' straw buyer transactions, these appraisals consistently contained the same types of false information. The discrepancies between the truth and the information contained in Moncrief's appraisal reports are simply too uniform to be explained away as merely a "sloppy" and "unprofessional" job, as Moncrief argues. This is demonstrated by the following:

! In the straw buyer transactions, Moncrief's appraisals all exceeded the value of the property listed on the MLS by between $100,000 and $200,000.

! Although Moncrief certified that he examined the MLS in preparing the appraisals, he uniformly omitted any mention of the MLS price in his appraisals, and he never disclosed any of the current published purchase prices for the properties, including the prices for which the Meis were contracting to purchase the properties.

! On each appraisal, Moncrief indicated that one of the Mei realty companies held title to the property, when in reality the Meis did not own the property at the time of the appraisal. In dozens of these cases, Moncrief was the realtor who arranged for the sale from the property's real owner to the Meis.

! Moncrief often listed the properties as vacant, even though they were occupied. In one instance, Moncrief listed the property as vacant even though the photograph of the property that he included in the appraisal showed the property's occupants.

15

! Moncrief never indicated on the appraisal that, as was often the case, he would receive a $3,000 finder's fee if the loan was approved and the sale of the property closed. From June 1998 until January 2000, Moncrief received $174,470 in finder's fees. Had lenders known that Moncrief was not disinterested in the approval of the loan, they would not have relied upon his appraisal.

! Moncrief always avoided including realtor yard signs in his photographs of the properties that he included in the appraisals. Frank Mei, Jr., testified that in some cases Moncrief removed the yard signs from the yards when the pictures were taken.

! In purchasing 8402 Braesdale, Moncrief signed and submitted a loan application falsely indicating that Hathaway Properties owned the property, falsely reporting that he was purchasing the property for $210,000, and falsely reporting he had $70,000 in his bank account. When this loan application was submitted, Moncrief was aware that 8402 Braesdale actually was owned by Camel Lee Girgis, that Girgis was selling his property for $147,500, and that Moncrief had approximately $700 in his savings account.

! As a result of the misrepresentations contained in Moncrief's loan application, he purchased 8402 Braesdale without having to make a down payment because the entire purchase amount was provided by the mortgage loan.

Against this evidence indicating that Moncrief knowingly and intentionally participated in the conspiracy to defraud lenders, Moncrief can point only to his denials to show that he did not intend to misrepresent any fact and that he was unaware of any misrepresentations. The jury's guilty verdicts compel this court to conclude that the jury did not credit Moncrief's claims that he was ignorant of the falsity of the representations contained in documents he signed, and that the jury did not believe Moncrief's testimony that he did not intentionally engage in conduct that helped conceal his misrepresentations, such as removing realty signs and omitting MLS data from his appraisals. Viewing these credibility determinations, as we must, in the light most favorable to the guilty verdict, we conclude that a rational trier of fact could have found Moncrief guilty beyond a reasonable doubt for conspiring to commit bank fraud.

16

Additionally, "[f]raudulent intent may be found from circumstantial evidence that one party arranged matters with another party in such a way as would facilitate the commission of fraud, especially where the evidence further shows that the first party gained money or advantage at the expense of the second." *United States v. Dadi*, 235 F.3d 945, 950 (5th Cir. 2000). Here, Moncrief performed his appraisals completely outside of the conventions of his profession in a way that facilitated the commission of the fraud, for which Moncrief received $3,000 payments on referrals and $300 payments for appraisals. The jury reasonably could have found fraudulent intent on this evidence.

The evidence adduced at trial clearly supports Moncrief's conviction for conspiring to commit bank fraud. Accordingly, we affirm the conviction of Moncrief for conspiring to commit bank fraud based on sufficiency of the evidence under either the miscarriage of justice standard or under the more lenient *Glasser* standard.[10]

---

[10] Moncrief argues that the court should make a negative inference due to the Government's failure to call Kevin Mei as a witness. However, the court may draw a negative inference only when the missing witness has information "peculiarly within his knowledge." *United States v. Wilson*, 322 F.3d 353, 363 (5th Cir. 2003) (quoting *Streber v. Comm'r of Internal Revenue*, 138 F.3d 216, 221-22 (5th Cir. 1998)). Here, Moncrief has failed to show that Kevin Mei possessed information peculiarly within his knowledge. Moncrief argues that only Kevin Mei could testify that he and Moncrief did not have an express agreement to collaborate in the conspiracy. However, Frank Mei, Jr., Frank Mei, Sr., and Daniel Mei all testified to the effect that Moncrief never made an express agreement to participate in the conspiracy. Instead, Moncrief learned of the Meis' formula and invited himself into the conspiracy. Accordingly, Moncrief has failed to show that Kevin Mei has unique testimony entitling Moncrief to a favorable inference. Moncrief also would not be entitled to the negative inference if Kevin Mei was mutually available to both sides as a witness. We need not address that issue.

**B.** *Sufficiency of the Evidence as to Other Charges–Vicarious Liability*

As to the counts of money laundering and illegal monetary transactions in criminally derived property, the evidence is undisputed that members of the conspiracy other than Moncrief committed these offenses. But, it is well-settled that a conspirator may be held criminally culpable for the substantive offenses committed in the course of the conspiracy of which he is a member, while he is a member, even if committed by other members of the conspiracy. *See United States v. Basey*, 816 F.2d 980, 997 (5th Cir. 1987); *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946). The evidence is sufficient to support the jury's verdict finding that Moncrief was a member of the conspiracy at all times relevant to the indictment. Thus, under conventional rules of vicarious liability, the jury verdict finding Moncrief guilty of all the substantive offenses in the indictment was supported by the evidence.[11]

**C.** *Ineffective Assistance of Counsel*

Moncrief's sole claim of ineffective assistance is based upon his attorney's failure to move for acquittal at the close of the defense's case. We have already reviewed the sufficiency of the evidence as to the conspiracy charge under both the miscarriage of justice and *Glasser* standards. Because a motion for acquittal appropriately would have been denied had it been made, Moncrief has failed to show that he was prejudiced by his attorney's allegedly deficient conduct. *See Rosalez-Orozco,* 8 F.3d at 199 (defining prejudice as showing within a reasonable probability that the result of the proceedings would have been different absent the attorney's errors). Accordingly, we reject Moncrief's claim of ineffective assistance of counsel.

---

[11] Because we affirm Moncrief's vicarious liability under the conspiracy theory, we do not need to address the issue of Moncrief's vicarious liability for aiding and abetting.

18

**D.**     *The Deliberate Ignorance Instruction*

Moncrief argues that the district court erred by including an instruction on deliberate ignorance in the jury charge.[12]  As both parties acknowledge, Moncrief's challenge on this ground is reviewed under the standard set out in *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003).  In that case, the court explained that "[t]he standard of review of a defendant's claim that a jury instruction was inappropriate is whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them."  *Id.*  "All reasonable inferences [are] drawn from the evidence in the light most favorable to the Government."  *Id.*

**1.**     *Moncrief's Challenge to the Factual Predicate for this Instruction*

A deliberate ignorance instruction is appropriate only where "the defendant claims a lack of guilty knowledge and the proof at trial supports the reasonable inference of deliberate ignorance." *United States v. Soto-Silva*, 129 F.3d 340, 345 (5th Cir. 1997).  There is no question here that Moncrief has claimed a lack of guilty knowledge throughout.  A reasonable inference of deliberate ignorance can be made upon a showing of "(1) the subjective awareness of a high probability of the existence of illegal conduct and (2) purposeful contrivance to avoid learning of the illegal conduct." *United States v. Saucedo-Muñoz*, 307 F.3d 344, 348 (5th Cir. 2002), *cert. denied*, 537 U.S. 1178

---

[12]  The district court gave the jury the following instruction:

> You may find that a Defendant had knowledge of a fact if you find that the Defendant deliberately closed his eyes to what would otherwise have been obvious to him.  While knowledge on the part of the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless or foolish, knowledge can be inferred if the Defendant deliberately blinded himself to the existence of a fact.

19

(2003). Moncrief argues that the evidence fails to show either prerequisite for drawing a reasonable inference of deliberate ignorance.

The deliberate ignorance instruction was given as part of the court's charge on the offense of illegal monetary transaction in criminally derived property. *See* 18 U.S.C. § 1957(a). In the context of that offense, the defendant must possess knowledge that the money used in a transaction was derived from a specific unlawful activity. *See Dadi*, 235 F.3d at 950. The jury was instructed that in this case the unlawful activity was bank fraud. Thus, the first issue is whether the evidence supports a finding that Moncrief was aware of the high probability that the Meis were making transactions in funds derived from bank fraud.[13] We already have concluded that the evidence was sufficient to convict Moncrief of conspiring to commit bank fraud. Accordingly, it is clear that the evidence sufficiently supported the conclusion that Moncrief was aware of a high probability that bank fraud was occurring.

Purposeful contrivance can be met by a showing that the defendant failed to investigate in the presence of highly suspicious behavior. *See United States v. Lara-Velasquez*, 919 F.2d 946, 953 (5th Cir. 1990) (failure to inspect a truck when his uncle, who had a poor reputation, loaned the defendant a truck with a distinctive paint job with instructions to drive in a circuitous route); *United States v. Scott*, 159 F.3d 916, 923 (5th Cir. 1998) (failure to verify the existence of treasury notes that the defendants leased to others for use as collateral to secure large loans).

---

[13] The government does not allege that Moncrief directly committed the illegal monetary transactions. Rather, the government's theory was that Moncrief aided and abetted the Meis in their commission of the monetary transactions alleged in the indictment, specifically, those involving 7515 Creekwood, 10314 Burgoyne, 8127 Northbridge, and 1406 East Brooklake Drive. To aid and abet "simply means to assist the perpetrator of a crime while sharing the requisite criminal intent." *See United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996).

Here, Moncrief failed to investigate in the presence of highly suspicious circumstances. Not only were the Meis hiring Moncrief to perform highly inflated appraisals in cases where the Meis were buying the properties for substantially less than the appraisal value, but Moncrief was aware that the FBI and HUD were investigating these highly irregular transactions. This evidence called on Moncrief to perform some investigation, yet the evidence is clear that he did nothing. In fact, Moncrief claims that his attention was diverted to such an extent that he failed even to read the sale and closing documents involved with the purchase of his own home. This is sufficient to support a finding of purposefully contrivance to avoid guilty knowledge. Accordingly, the district court had an adequate factual predicate to instruct the jury on deliberate ignorance with respect to the offense of illegal money transactions.

## 2.     *Moncrief's Challenge to the Instruction Based on Specific Intent*

In his second argument as to the deliberate ignorance instruction, Moncrief argues that the instruction should not be given in conjunction with specific intent crimes such as bank fraud and money laundering. Because Moncrief failed to preserve this argument,[14] the standard of review on this claim is plain error. Under plain error review, this court can reverse the district court only upon finding that: (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights. *See United States v. Gracia-Cantu*, 302 F.3d 308, 310 (5th Cir. 2002). Once a plain error has been shown, this court retains discretion over whether to correct the error and will do so only upon finding that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993).

---

[14] While Moncrief objected to the deliberate ignorance instruction, he did so solely on the basis that the government did not provide a sufficient factual predicate to warrant the instruction. Thus, Moncrief failed to preserve his right to appeal on this second basis.

21

Moncrief bases his argument primarily on *United States v. Chen*, 913 F.2d 183, 190 (5th Cir. 1990), a case in which this court approved granting of a deliberate ignorance instruction as to one count of the indictment but reversed because a deliberate ignorance instruction was given as to the offense of maintaining a place for the purpose of distributing a controlled substance. The offense in that case required a specific intent – namely, the intent to maintain a place for the purpose of distributing a controlled substance. *Id.* at 190. Here, the deliberate ignorance instruction was given as part of the court's instruction to the jury as to the offense of illegal monetary transactions in criminally derived property. This offense only requires knowledge, not specific intent.[15] *See Dadi*, 235 F.3d at 950. The holding of *Chen* therefore is inapposite. At the most, *Chen* suggests that a deliberate ignorance instruction may be inappropriate for certain offenses requiring specific intent. *See id.* Moreover, subsequent cases have demonstrated a reluctance to expand *Chen* to other specific intent offenses. Relevant here, the Fifth Circuit has approved the deliberate ignorance instruction in cases involving the following offenses: bank fraud, *see Scott*, 159 F.3d at 924; conspiracy, *see Soto-Silva*, 129 F.3d at 345; and money laundering, *see United States v. Fuller*, 974 F.2d 1474, 1482 (5th Cir. 1992). All of these cases require specific intent. Accordingly, we find no plain error in the district court's deliberate ignorance instruction.

---

[15] To convict for monetary transactions involving property derived from specified unlawful activity under 18 U.S.C.
§ 1957(a), the government must prove that (1) the defendant knowingly engaged or attempted to engage in a monetary transaction (2) in criminally derived property that is of a value greater than $10,000 and (3) is derived from specified unlawful activity. *See Dadi*, 235 F.3d at 950. Specific intent is not required.

**III.**    *Moncrief's Challenge to the Sentence*

**A.**    *Incorrect Application of the 2000 Edition of the Guidelines*

Citing *ex post facto* concerns, the Presentence Report ("PSR") applied the 2000 Sentencing Guidelines rather than the 2001 Guidelines. Under the 2000 edition's section for grouping offenses, Moncrief's offense level was determined under section 2S1.1. *See* U.S.S.G. § 3D1.2 (Nov. 1, 2000). Concluding that Moncrief had laundered $24,330,339, section 2S1.1 produced an offense level of 33. The PSR recommended the application of an enhancement under section 3B1.3 because Moncrief used a special skill to commit the offense. It also recommended an enhancement for obstruction of justice. The district court adopted the PSR, admitted it into the record, and accepted all of the PSR's recommendations. It denied Moncrief's request for a downward departure. This left Moncrief with a total offense level of 37 and a sentencing range of 210-267 months' imprisonment. The district court imposed a 210-month sentence. The statutory maximum that Moncrief could have received was 240 months (twenty years), t he maximum penalty that can be given for the offense of money laundering. *See* 18 U.S.C. § 1956(a)(1).

Moncrief argues that the district court erred by applying section 2S1.1 of the 2000 edition of the Sentencing Guidelines, and not the 2001 edition. Between 2000 and 2001, section 2S1.1 was almost completely rewritten. We will review this claim for plain error because Moncrief failed to object to the application of the 2000 edition of the Sentencing Guidelines before the district court.[16]

---

[16]  Moncrief argues that he should be deemed to have preserved his appeal on this issue because he cited to the 2001 edition of the Sentencing Guidelines in his objection to the PSR. The only reference to the 2001 edition of the Guidelines in Moncrief's objection to the PSR is as follows: "According to USSG § 2B1.1 cmt. n.2(b) (Nov. 1, 2001), gain is to be used as an alternative measure of loss if there is a loss but it reasonably cannot be determined." Even under the most generous reading, this bare citation to the 2001 edition of the Guidelines cannot be construed to have placed before the district court the argument that the PSR erred by applying the 2000 edition of the Guidelines, rather than the 2001 edition. The argument therefore was forfeited.

23

When reviewing alleged errors in the application of the Sentencing Guidelines for plain error, the defendant must show a clear and obvious error, and he must show that the error affected his substantial rights by establishing that the sentence would have been different but for the alleged error. *See United States v. Calverley*, 37 F.3d 160, 165 (5th Cir. 1994) (en banc).

Here, the district court's error is clear and obvious. The court used the 2000 edition of the Guidelines and should have used the 2001 edition of the Sentencing Guidelines.[17] However, Moncrief cannot show prejudice. As discussed above, under the 2000 edition of the Guidelines, Moncrief accumulated an offense level of 37, which produced a sentencing range of 210 to 262 months. By comparison and as outlined below, under the 2001 edition of the Guidelines Moncrief would receive an offense level of 36, which would produce a sentencing range of 188 to 235.

To evaluate whether the district court's mistaken use of the 2000 Guidelines prejudiced Moncrief, we must determine what Moncrief's sentence would have been under the 2001 Guidelines. It is undisputed that the analysis begins with section 2S1.1. The 2000 version of 2S1.1 had a base of 23 and then added points based upon the amount of money that was laundered. By contrast, the 2001 version calculates the base offense level with reference to whatever offense was involved in generating the money that was laundered. Moncrief agrees that because the proper underlying offense is bank fraud, the correct base offense level under the 2001 Guidelines is determined under

---

[17] Under section 1B1.11 of the Sentencing Guidelines, the sentencing court is to use the Guidelines edition in effect on the date of sentencing unless such use would violate the *ex post facto* clause of the United States Constitution. If so, then the court must use the edition of the Guidelines in effect on the date that the offense of conviction was committed. *See* U.S.S.G. § 1B1.11(b)(1) (Nov. 1, 2001). Because sentencing took place while the 2001 edition of the Guidelines was in effect and the offenses of conviction contained in the indictment were committed while the 1998 edition of the Guidelines was in effect, these are the only two editions that the district court properly could have used. Since there were no valid *ex post facto* issues, the 2001 edition of the Guidelines should have been used. The version of section 2S1.1 in the 1998 Guidelines is identical to the version in the 2000 Guidelines, though both differ substantially from the 2001 version.

section 2B1.1. Section 2B1.1(a) establishes a base offense level of 6. *See* U.S.S.G. § 2B1.1(a) (Nov. 1, 2001). Under 2B1.1(b)(1), the offense level must be increased according to the value of the loss caused by the bank fraud. *See* U.S.S.G. § 2B1.1(b)(1) (Nov. 1, 2001).

The PSR, which the district court adopted, calculated the loss at $7,385,740. Moncrief now challenges the court's finding of a $7.3 million loss. Moncrief argues that the amount should be reduced due to several factors, *viz.*: (1) due to payments that the Meis made on the mortgages, (2) the fact that the Meis resold some of the properties thereby repaying those loans, and (3) because, pursuant to Application Note 2(E)(ii), the district court should have considered the value of collateral at the time of sentencing, and not at the time that the fraud was committed.

Moncrief's first two arguments must be rejected. The Commentary following section 2B1.1 provides:

> The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. . . . The estimate of the loss shall be based upon available information, taking into account, [such factors] as appropriate and practicable under the circumstances . . . .

U.S.S.G. § 2B1.1, cmt. n.2(C) (Nov. 1, 2001).

Moncrief has failed to show that the district court's estimate of the loss was unreasonable. While he points to factors such as payments made to the lenders and the resale of some of the properties, Moncrief fails to show that such data actually was, or is, available, or that it can be practicably obtained and factored into the court's estimate. Thus, Moncrief has failed to show that the district court committed plain error.[18]

---

[18] Although Moncrief made the first two arguments in the court below, he did not relate this error to using the 2000 Guidelines rather than the 2001 Guidelines. Consequently he did not preserve this issue for appeal. Even if

Moncrief's third challenge to the district court's loss finding is based on Application Note 2(E)(ii) of section 2B1.1. Application Note 2(E)(ii) provides:

> *Credits Against Loss.* — Loss shall be reduced by the following: . . . (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from the disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1, cmt. n.2(E)(ii) (Nov. 1, 2001). Contrary to this Application Note, the PSR used the value of the collateral at the time the bank fraud occurred, not at the time of sentencing. Moncrief argues that if the PSR had used the value of the collateral at the time of sentencing rather than at the time of the fraud, the PSR would have arrived at a reduced loss calculation.

This argument fails for two reasons. Moncrief failed to raise any argument based upon Application Note 2(E)(ii) in his original brief, so the Court need not address it. *See Hadnot v. Bay*, 344 F.3d 474, 476 n.4 (5th Cir. 2003) (court does not need to consider an argument first raised in the appellant's reply brief). Furthermore, we note that even if we addressed this issue, to succeed under the plain error standard, Moncrief would need to show that the failure to follow Application Note 2(E)(ii) would result in a reduction of his sentence. Moncrief has not met this burden because there is no evidence in the record to show that the loss would amount to less than $7 million if the value of the collateral had been established at the time of sentencing rather than the time the crimes

Moncrief had objected and preserved this point, a district court's calculation of loss attributable to a defendant's scheme to commit fraud is a factual finding that this court reviews for clear error. *See United States v. Sidhu*, 130 F.3d 644, 654 (5th Cir. 1997). Moncrief has shown neither plain nor clear error.

were committed. On plain error review, Moncrief cannot prevail under Application Note 2(E)(ii) without such evidence. *See Calverley*, 37 F.3d at 165.[19]

In light of the foregoing, we hold that the PSR's estimate of loss should be accepted. Applying the PSR's finding that Moncrief's fraud caused a loss of $7.3 million, the Guidelines require the court to add 20 points to Moncrief's base offense level. *See* U.S.S.G. § 2B1.1(b)(1)(K) (Nov. 1, 2001).

Under section 2B1.1(b)(2)(A), two more points must be added because the PSR clearly shows the involvement of more than ten victims.[20] Under section 2B1.1(b)(8), two more points must be added because the offense involved sophisticated means, which the application notes define as "especially complex or intricate offense conduct" including "the use of fictitious entities [and] corporate shells . . . ." U.S.S.G. § 2B1.1, cmt. n.6(B) (Nov. 1, 2001). The government argues that a four-point enhancement applies under subsection (b)(12), but Moncrief is correct that no evidence in the record demonstrates that the safety or soundness of any financial institution was jeopardized by Moncrief's bank fraud, so these four points should not be added. This produces a base offense level of 30 under section 2B1.1.

Moncrief agrees that two more points must be added under section 2S1.1(b)(2)(B) because Moncrief was convicted under 18 U.S.C. § 1956. Both parties also agree that subsection (b)(3) of section 2S1.1 does not apply. Application Note 5(B) specifically instructs that subsection (b)(3) does not apply when, as is the case here, "the conduct that forms the basis for an enhancement under the

---

[19] This argument was not made in the court below nor in Moncrief's original brief. It appears for the first time in Moncrief's Reply Brief.

[20] Appended to the PSR was a list of ninety-five transactions involving dozens of defrauded lenders to whom Moncrief submitted a fraudulent appraisal.

guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) . . . ."  U.S.S.G. § 2S1.1, cmt. n.5(B) (Nov. 1, 2001).  Both parties agree that a two-level enhancement under section 3B1.1 applies.  Adding these two points to the points accumulated under sections 2S1.1 and 2B1.1 produces an offense level subtotal of 34.

### B.    *Obstruction of Justice*

We turn now to the last issue for consideration in determining whether the district court plainly erred by applying the 2000 Guidelines.  The district court imposed a two-level enhancement under section 3C1.1 for obstruction of justice.  The district court based the enhancement on the combination of two acts which the court found were committed by Moncrief,[21] perjury and obstruction of justice.  The primary basis for the enhancement was perjury.  The district court found that Moncrief perjured himself in the following testimony:

Q:    Mr. Moncrief, did you ever make any representation or omit information in these appraisal reports with the intention to deceive or cheat or defraud a lender?
A:    No.

The second basis was for attempted bribery.  In May 1999, Special Agent Kepler served a subpoena for documents on Moncrief.  Along with his response to the subpoena, Moncrief submitted an appraisal of Kepler's house.  The appraisal valued Kepler's home at $280,000.  Eighteen months earlier, Kepler had purchased the home for $140,000.  On the appraisal, someone, presumably Moncrief, had written the sum $280,000 followed by a question mark.

---

[21]    Moncrief disputes whether, in applying the enhancement, the court relied upon Moncrief's apparent attempt to bribe Special Agent Kepler with an inflated appraisal.  The record clearly indicates that the district court relied on both the false testimony and the attempted bribe.

In *United States v. Dunnigan*, 507 U.S. 87, 94-95 (1993), the Supreme Court held that prior to imposing a sentencing enhancement for obstruction of justice due to perjury, a sentencing court must make independent factual findings that the testimony was intentionally false, material, and was not due to confusion, mistake, or faulty memory. The district court here cited portions of Moncrief's testimony and made specific findings that the testimony was false, that it was material, that Moncrief gave the testimony with the willful intent to provide false testimony, and that the false testimony was not due to mistake, confusion, or faulty memory. The district court ruled that these findings provided a sufficient basis to conclude that Moncrief gave this testimony with a willful intent to obstruct the administration of justice and imposed the enhancement. Moncrief now argues that the court clearly erred because there was no evidence that Moncrief possessed the intention to deceive lenders.

The district court did not clearly err. In the first place, by convicting Moncrief of bank fraud, the jury necessarily found that Moncrief did make false representations with the intent to deceive lenders. We already have ruled that the evidence clearly supported this conclusion. Secondly, the district court relied upon Moncrief's attempted bribe as evidence that Moncrief's fraudulent actions were deliberate. Moncrief provided no innocent explanation for how the inflated appraisal of Kepler's house was included with the materials submitted in compliance with the subpoena. Why would Moncrief go to the trouble to make an appraisal of Kepler's house? And why would Moncrief give the inflated appraisal to Kepler but to try to influence him? The trial evidence as to perjury along with the attempted bribe provides ample evidence to sustain the district court's finding that Moncrief obstructed justice.

Adding the final two points for obstruction of justice produces, under the 2001 Guidelines, a total offense level of 36.[22] With an offense level of 36 and criminal history of I, Moncrief's sentencing range would be 188 to 235 months. By comparison, under the 2000 Guidelines, the district court sentenced Moncrief to 210 months, which is within the range produced under the 2001 Guidelines. Moncrief therefore has failed to establish that he necessarily was prejudiced by the district court's mistaken application of the 2000 Guidelines rather than the 2001 Guidelines. Accordingly, Moncrief has failed to show that his sentence was plainly erroneous.[23] *See United States v. Leonard*, 157 F.3d 343, 346 (5th Cir. 1998) (where an error in the application of the Sentencing Guidelines is shown but on remand the district court could impose the same sentence, the court will uphold the sentence despite the trial court's error).

## IV. *Downward Departure*

This court has jurisdiction to review a district court's denial of a motion for a downward departure only if the district court denied the motion based upon an error of law. *See United States v. Buck*, 324 F.3d 786, 797 (5th Cir. 2003). Under this principle, this court possesses jurisdiction

---

[22] The arithmetic involved in arriving at this offense level is as follows:

| | | |
|---|---|---|
| 2B1(a) | 6 | (base offense level) |
| 2B1.1(b)(1)(K) | add 20 | (due to a loss of $7.3 million) |
| 2B1.7(b)(8) | add 2 | (because sophisticated means were used) |
| 2B1.7(b)(2)(B) | add 2 | (because there were more than ten victims) |
| 2S1.1 | add 2 | (for a conviction under 19 U.S.C. § 1956) |
| 3B1.1 | add 2 | (because a special skill was involved) |
| 3C1.1 | add 2 | (obstruction of justice) |
| Total offense level: | 36 | |

[23] Prior to argument, counsel for Moncrief submitted a 28(j) letter directing the court's attention to the Supreme Court's opinion in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), in which the Supreme Court found that certain enhancements that were added to a defendant's sentence under the State of Washington's sentencing guidelines violated the defendant's constitutional right to a jury trial. Without deciding whether Moncrief's filing of the 28(j) letter preserves the issue, we note under *United States v. Pineiro*, 377 F.3d 464 (5th Cir. 2004), this court has ruled that *Blakely* does not apply to the Federal Sentencing Guidelines. *Blakely* therefore is inapplicable to the instant case.

to review the denial if the denial was premised on the district court's mistaken understanding that the Guidelines do not permit a departure. *Id.* However, jurisdiction is lacking where the district court's refusal to grant the departure is based upon a conclusion that the departure is not warranted by the facts of the case. *Id.*

Here, the district court expressly acknowledged its authority to depart. The district court explained that it declined to do so based upon the court's conclusion that there was no principled basis on which to depart. Based upon these statements, we hold that the district court did not misunderstand its authority to depart. The record is clear that the district court would not depart downward even if we remanded the case for resentencing. Accordingly, this court lacks jurisdiction to review the district court's denial of Moncrief's motion for a downward departure. *See Buck*, 324 F.3d at 797.

## V. *Cumulative Error*

The only error that Moncrief has established was the district court's mistaken application of the 2000 edition of the Sentencing Guidelines, rather than the 2001 Guidelines. However, Moncrief has failed to show that the error harmed him, and he has failed to establish other errors with which that error could be combined to produce a cumulative prejudicial impact that would justify a new trial. Thus, Moncrief's argument that the district court's cumulative errors denied him of his right to due process must be denied.

## VI. *Conclusion*

For the foregoing reasons, we affirm the judgment of conviction and sentence.

AFFIRMED

31