**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11086

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

GAIL RUSS,
VILAIRE DUROSEAU,
CASSANDRE JEAN,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cr-60007-AHS-1

_____

Before JILL PRYOR, BRANCH, and BLACK, Circuit Judges.

PER CURIAM:

2                        Opinion of the Court                        24-11086

Gail Russ, Vilaire Duroseau, and Cassandre Jean (collectively, Appellants) appeal their convictions and sentences for wire fraud and conspiracy to commit wire fraud.  They bring several issues on appeal, which we address in turn.  After review, we affirm the Appellants' convictions and sentences.

## I.  BACKGROUND

We include a brief background to put the issues presented into context.  In January 2023, Russ, Duroseau, and Jean were charged in a 14-defendant grand jury indictment with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 1), and substantive wire fraud counts, in violation of 18 U.S.C. § 1343 (Counts 2-25).  The indictment alleged that, from about April of 2016 through July of 2021, the co-conspirators issued fraudulent nursing diplomas and transcripts to "unlawfully enrich themselves."  The indictment explained that, to be a licensed Registered Nurse (RN) or a Licensed Practical/Vocational Nurse (LPN/VN), an individual must graduate "from an approved pre-licensure nursing program" and take the licensing exam.  The indictment identified seven co-conspirators, who obtained the fraudulent transcripts and diplomas utilizing them to work for health care employers, and seven different health care employer victims, who hired fraudulently qualified nurses.

The indictment alleged the purpose of the conspiracy as follows:

> It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich

themselves by, among other things: (a) soliciting and recruiting co-conspirators, via interstate wire communications, seeking nursing credentials to obtain employment as an RN or LPN/VN in the health care field; (b) creating and distributing, via interstate wire communications, false and fraudulent diplomas and transcripts for co-conspirators seeking RN or LPN/VN licensure and employment in the health care field; (c) using the false and fraudulent documents to obtain employment, pay, and other benefits in the health care field; (d) concealing the use of fraudulent documents used to obtain employment in the health care field; and (e) using proceeds of the conspiracy for their personal use and benefit, and the use and benefit of others, and to further the conspiracy.

The indictment alleged that Duroseau, Jean, and other co-conspirators used interstate wire communications to recruit "co-conspirators . . . seeking nursing credentials and employments as an RN or LPN/VN in the health care field." The indictment alleged that Russ, Duroseau, Jean, and other co-conspirators:

> caused others to send, via interstate wire communications, information used to create false and fraudulent official transcripts and diplomas . . . falsely and fraudulently representing that the co-conspirators attended . . . and completed the necessary courses and/or clinicals to obtain RN or LPN/VN diplomas, when in fact the co-conspirators had never actually completed the necessary courses and/or clinicals.

Additionally, "[i]n furtherance of the conspiracy, co-conspirators" used the fraudulent diplomas and transcripts, "to obtain licensure as an RN or LPN/VN in various states" and "to fraudulently obtain employment benefits as an RN or LPN/VN at various unwitting health care providers throughout the country . . . [that] hired and paid salaries, wages, and other benefits to the RNS and LPN/VNs based on their fraudulent credentials." Co-conspirators used the proceeds "for their personal use and benefit, and to further the conspiracy."

Appellants went to trial, where many employers who hired individuals based on fraudulent qualifications testified that, had they known the individual was not actually a qualified nurse, they would not have hired, or promoted the individual, nor paid or increased their pay. After a 13-day trial, the jury returned a verdict on December 15, 2023, finding Russ guilty of Counts 1, 12-18, 20-22, and 24-25, and not guilty of Counts 3-6 and 19. The jury found Duroseau guilty of all counts charged: Counts 1, 10, 14, and 23. The jury also found Jean guilty of all counts charged: Counts 1, 12, 17, 20, and 25.

## II. DISCUSSION

### A. Convictions

First, Appellants contend the district court improperly denied their various motions to dismiss the indictment, for acquittal,

24-11086                    Opinion of the Court                    5

and for a new trial,[1] because it erred in its determinations that: (1) the Government proceeded under a traditional theory of property fraud, rather than the right to control theory rejected by the Supreme Court; and (2) the salaries paid to the Appellants' co-conspirators—based on fraudulent nursing credentials the Appellants' aided in distributing—constituted "money or property" under the wire fraud statute.

### 1. Property Fraud

"The wire fraud statute criminalizes schemes or artifices to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (quoting 18 U.S.C. § 1343) (quotation marks and alterations omitted). To obtain a conviction for wire fraud under § 1343, the government must prove: (1) a defendant's "intentional participation in a scheme to defraud, and (2) the use of the interstate wires in furtherance of that scheme." *United States v. Estepa*, 998 F.3d 898, 908 (11th Cir. 2021) (quotation marks and alterations omitted). "And, to prevail

---

[1] We generally review a district court's denial of a motion to dismiss a charging document for an abuse of discretion. *United States v. Noriega*, 117 F.3d 1206, 1211 (11th Cir. 1997). However, "[t]o the extent [an appellant's] assignments of error on these matters implicate the district court's resolution of questions of law," we apply a de novo standard of review. *Id.* We review a challenge to the denial of a Federal Rule of Criminal Procedure 29 motion for judgment of acquittal de novo. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015). We review the district court's ruling on a defendant's Federal Rule of Criminal Procedure 33 motion for a new trial for an abuse of discretion. *United States v. Brown*, 934 F.3d 1278, 1294, 1297 (11th Cir. 2019).

on the conspiracy charge, the government must additionally prove three things: (1) agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." *Id*. at 908-09 (quotation marks omitted).

Because the federal fraud statutes "protect property rights only," "the Government must prove not only that wire fraud defendants engaged in deception, but also that money or property was an object of their fraud." *Ciminelli*, 598 U.S. at 312 (quotation marks and alteration omitted). For example, because the federal fraud statutes only protect "traditional concepts of property," state and municipal licenses are not "property," as that term is used in § 1343. *See Cleveland v. United States*, 531 U.S. 12, 15, 24, 26-27 (2000) (applying to the mail fraud context); *see also Ciminelli*, 598 U.S. at 312 n.2 (explaining that cases involving the federal mail fraud statute, 18 U.S.C. § 1341, are applicable to cases involving the federal wire fraud statute because the two statutes contain identical language). A wire fraud prosecution may not rely solely on depriving an entity of its right to control its own assets. *Ciminelli*, 598 U.S. at 311-12. "The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest. Accordingly, the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id*. at 316.

24-11086                Opinion of the Court                7

The Supreme Court has also held to support a § 1343 conviction, it does not matter if "the defendant provides something—be it money, property, or services—of equal value in return," as long as the defendant "schem[ed] to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." *Kousisis v. United States*, 605 U.S. 114, 123-24 (2025). Further, the Supreme Court clarified "the fraudulent-inducement theory is not a repackaging of the right-to-control theory," as the fraudulent-inducement theory "protects money and property," while the "right-to-control theory" protects mere information. *Id.* at 1398 (quotation marks and alteration omitted). Our precedent holds a defendant is only guilty of fraud where the defendant lies "about the nature of the bargain" itself. *See United States v. Takhalov*, 827 F.3d 1307, 1313-14 (11th Cir. 2016) (explaining this often involves a "lie about the characteristics of the good (*e.g.*, if he promises that a gemstone is a diamond when it is in fact a cubic zirconium)"), *overruled in part by Kousisis*, 605 U.S. at 124 (holding "a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property' regardless of whether he seeks to leave the victim economically worse off").

We conclude the district court did not err in its determination that the Government proceeded under a traditional theory of property fraud rather than the right-to-control theory. While the Appellants rely on *Ciminelli*, that case is not applicable. In *Ciminelli*, the government's theory was "that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." 598 U.S. at 310.

Ultimately, the victim in *Ciminelli* received the contract it bargained for, and the fact it might have bargained for something else if not for the defendant's conspiracy was insufficient to state a property interest that could support a wire-fraud conviction. *See id.* at 309-10, 314-17.

In Appellants' case, however, the Government's theory was, beginning with the indictment, that the Appellants helped to deprive the victim health care providers of the "employment, pay, and other benefits" paid to the Appellants' co-conspirators based on the fraudulent credentials they distributed. Throughout the trial, the Government presented numerous health care employers of the co-conspirators who testified they paid additional salaries and benefits they otherwise would not have paid without the fraudulent scheme. Notably, the Government did not seek any instructions relating to the right-to-control theory in relation to the jury instructions. It repeatedly stated in its responses to the Appellants' motions and special jury instructions that it was not prosecuting this case under the right-to-control theory, but under a traditional theory that money, in the form of pay to health care employers, was the object of the scheme. Additionally, in presenting its case to the jury in closing arguments, the Government completed calculations to show the amount of money lost by health care employers via the salaries of fraudulently qualified nurses, and the Government specifically stated it was "not alleging that the employers were defrauded out of a nursing license," as "they were defrauded out of cold hard cash, money, not property," via the money "paid by the employers to the nurses," which "is sufficient under the wire fraud

statute." Furthermore, Jean's renewed motions and motion for new trial, adopted by both Duroseau and Russ, acknowledged the trial evidence "[a]t best" established "co-conspirators used fraudulent diplomas and transcripts to obtain nursing licenses and utilized the needed licenses to secure employment and benefits at various unwitting health care providers," who then "paid salaries, wages, and other benefits to the RNs and LPN/VNs based on their fraudulent credentials," meaning that even the Appellants admit the Government proved that employers paid money due to the fraudulent credentials.

Thus, unlike *Ciminelli*, the Appellant's scheme involved more than the deprivation of "valuable economic information necessary to make discretionary economic decisions." Rather, it involved a classic case of fraud—as the qualifications and credentials of Appellants' co-conspirator nurses went to the very nature of the bargain with the victim employers and led the co-conspirators to obtain money from the victim employers. Indeed—much like receiving cubic zirconium when a diamond was promised—here, the employers received counterfeit nurses in exchange for salaries. *Takhalov*, 827 F.3d at 1313-14. Furthermore, like Kousisis received a contract, and subsequent pay, based on his promise to use a disadvantaged supplier, when in fact that supplier was a fraudulent company made up to obtain the contract, here, the co-conspirator nurses received their contracts, and subsequent pay, based on false credentials they presented to obtain the employment contract and pay. *Kousisis*, 605 U.S. at 118-19, 123-24. Just like the Supreme Court found in *Kousisis*, the fraudulent inducement theory differs

from the right to control theory, and as long as the individuals ob-
tained the contract through fraudulent means, it does not matter
that services were provided because wire fraud still occurred as the
money was obtained fraudulently. *Id.* at 123-24, 134. Further, it
would not even matter if those services were adequate, as the
nurses fraudulently induced the health care providers into provid-
ing them salaries, or at least higher salaries, based on the fake qual-
ifications. *Id.* at 123-24.

Accordingly, because this theory was sufficiently alleged in
the Appellants' indictment and the Government repeatedly stated
it was prosecuting the Appellants based on a theory that their
scheme was meant to defraud health care employers of money, the
district court did not err in rejecting the Appellants' various mo-
tions based on its legal determination that the Government pro-
ceeded under a traditional theory of property fraud rather than the
right to control theory rejected in *Ciminelli*.

### 2. Salaries of Nurses

Nor was it error to allow the salaries paid to the co-conspira-
tor nurses to be considered as money under the wire fraud statute.
The Supreme Court has held that wages paid by a third party in the
course of a defendant's dishonesty do not satisfy the money or
property element of fraud statutes where those wages are merely
incidental to—and not the object of—the scheme to defraud. *Kelly
v. United States*, 590 U.S. 391, 393-94, 400 (2020). However, the Ap-
pellants' reliance on *Kelly* is misplaced, as there, the salaries paid to
Port Authority employees were merely the "incidental cost" of

implementing the defendants' scheme to punish a mayor for refusing to support the governor's reelection bid by exercising regulatory power to close toll lanes during rush hour traffic. *See id.* Here, in contrast, the indictment alleged—and evidence sufficiently established—that a purpose of the scheme was to obtain pay and benefits for Appellants' co-conspirators to which they were not qualified or entitled. The point, and not a mere byproduct, of having a fraudulent nursing diploma is to use it to eventually obtain nursing employment. Thus, unlike *Kelly*, far from being incidental to the overarching purpose of the scheme, obtaining the salaries in a fraudulent manner was a purpose of the Appellants' conspiracy.

Russ and Duroseau argue the Government did not prove they personally "ever interacted with, deceived, or deprived any of the healthcare employers of money or property as required by the wire fraud statute," and further, that the healthcare employers were not deprived as they received services from the "nurses." *Kousisis* held that wire fraud can still occur, even when the victim receives services, if they were defrauded into that agreement by a defendant who seeks to obtain money or property, as was the case with the co-conspirator nurses here. 605 U.S. at 123-24. Second, it does not matter if Russ or Duroseau personally engaged with the health care providers as the co-conspirator nurses' receipt of salaries based on the fraudulent credentials was not only " a reasonably foreseeable consequence of the . . . conspiracy alleged" in the indictment, but rather, the indictment expressly alleged this was a purpose of the conspiracy. *See Smith v. United States*, 568 U.S. 106, 111 (2013) ("Since conspiracy is a continuing offense, a defendant

who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot."(alteration and internal citations omitted)); *United States v. Alvarez*, 755 F.2d 830, 848 (11th Cir. 1985) (stating the touchstone is whether those acts were "a reasonably foreseeable consequence of the . . . conspiracy alleged in the indictment").

Accordingly, the district court did not err by denying the Appellants various motions to dismiss the indictment, for acquittal, and for new trial, and we affirm as to this issue.

## B. Juror Replacement

Second, Russ and Duroseau assert the district court abused its discretion by dismissing a black juror unilaterally without questioning, or allowing the other parties to question, the juror on the record in violation of their Sixth Amendment rights. Duroseau also contends the unilateral dismissal of the juror violated his Fifth Amendment due process rights.[2]

The court may excuse a juror and replace him with an alternate if, prior to deliberations, the juror is found to be "unable" or "disqualified" to perform his duties. Fed. R. Crim. P. 24(c); *United States v. Fajardo*, 787 F.2d 1523, 1525 (11th Cir. 1986). Absent a

---

[2] We generally review a district court's decision to replace a juror for an abuse of discretion and constitutional questions de novo. *United States v. Augustin*, 661 F.3d 1105, 1129 (11th Cir. 2011) (defining the standard for replacing a juror); *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004) (defining the standard for constitutional questions).

showing of bias or prejudice to the defendant, we will not disturb the district court's decision. *Fajardo*, 787 F.2d at 1525. Prejudice or bias can include the discharge of a "juror without factual support, or for a legally irrelevant reason." *United States v. Puche*, 350 F.3d 1137, 1152 (11th Cir. 2003) (quotation marks omitted). We have found the district court did not abuse its discretion by removing two jurors who "napped regularly throughout the trial" as they could not perform their duties as jurors. *United States v. Smith*, 550 F.2d 277, 285-86 (5th Cir. 1977).[3]

The district court may excuse a juror without holding a separate hearing where a juror is clearly unable to continue to serve, such as where a juror suffers a heart attack or sleeps in open court. *Fajardo*, 787 F.2d at 1525. A hearing or other investigation is an appropriate use of the court's discretion, however, "[w]here the juror's disability is less certain or obvious." *Id.* (quotation marks omitted). The trial judge "does not need a defendant's consent to replace a juror with an alternate before the jury retires; all that is required is a reasonable cause for the replacement." *Id.* at 1526.

The Sixth Amendment requires that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. We have found a violation of a criminal defendant's Sixth Amendment right "to a unanimous jury verdict" when the district court abused its

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

discretion by dismissing a juror, "after the start of deliberations," when the record did "not unambiguously show that [the j]uror" engaged in misconduct. *United States v. Brown*, 996 F.3d 1171, 1175, 1194 (11th Cir. 2021) (en banc). The Fifth Amendment requires that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

The district court did not abuse its discretion by removing the juror, as the juror's inability to stay awake, alone, provides a strong factual basis that he was unable to perform his duties as a juror. Fed. R. Crim. P. 24(c); *Fajardo*, 787 F.2d at 1525; *Puche*, 350 F.3d at 1152; *Smith*, 550 F.2d at 285-86; *Brown*, 996 F.3d at 1175, 1194. The record includes additional factual bases for the juror's removal, including the distraction he was causing to other jurors and the court, via efforts to keep him awake and his smell. Russ and Duroseau claim their Sixth Amendment rights to "a unanimous verdict by a jury of ordinary citizens" was violated, in part because the juror was the only black juror; however, the record shows the parties agreed to another black juror during voir dire. The dismissal was not prejudicial as the record shows sufficient factual support for the district court determining the juror's inability to continue, and there was no Sixth Amendment violation.

The district court also did not abuse its discretion when it did not hold a separate hearing which could have included questioning the juror, because when a juror is clearly unable to continue as a juror based on actions such as sleeping in open court, a hearing is not necessary. *Fajardo*, 787 F.2d at 1525. Additionally, even

though the district court did not hold a hearing with the juror and the parties on the record, the district court discussed his concerns about the juror's attentiveness and distractions numerous times with the parties prior to the juror's dismissal, and despite these numerous opportunities, the parties did not ask for a chance to question the juror until after he was excused. We have stated a district court "does not need a defendant's consent to replace a juror with an alternate before the jury retires . . . [as long as there] is a reasonable cause for the replacement," so Duroseau's Fifth Amendment due process rights were not violated, as the juror's sleeping and distractions were cause for replacement. *See id.* at 1526. Accordingly, we affirm as to this issue.

## C.  Loss Amount

Third, Russ and Duroseau assert that, because the co-conspirator "nurses'" wages do not constitute "money or property" under the wire fraud statute, the district court erred in its loss calculations pursuant to U.S.S.G. § 2B1.1(b)(1).

The Guidelines provide general principles as to how the court should calculate the loss amount, but the appropriate method for calculating loss is highly fact-dependent, and thus, "district judges are entitled to considerable leeway in choosing how to go about this task." *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014). The Guidelines only require the district court to make a reasonable estimate of loss. *Id.* Where an estimate of loss is not feasible, a court may use a gain calculation in place of a loss calculation. *See United States v. Bracciale*, 374 F.3d 998, 1003-04 (11th

Cir. 2004).  However, a court should not use a gain calculation in place of a loss calculation where there is "a reasonable estimate of the victims' loss based on existing information." *Id*. at 1004 (quotation marks omitted).

A review of the record reveals the district court did not base the U.S.S.G. § 2B1.1 enhancements on the lost wages from the healthcare employers, but instead utilized the gain method.  The gain method is a proper way to calculate loss under the Guidelines, and no party objects to the use of the gain method nor the underlying factual basis for the calculations made by the district court. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (clarifying a party abandons an issue through forfeiture by failing to raise the issue in an initial brief on direct appeal and holding that forfeited issues will not be addressed absent extraordinary circumstances).  Accordingly, we affirm as to this issue.

## III.  CONCLUSION

We affirm the Appellants' convictions because the record shows the Government's theory of the case was that Appellants helped defraud health care providers out of salaries and benefits paid to their falsely credentialed nurse co-conspirators rather than merely defrauding the employers of the right to control their discretionary economic decisions. Additionally, the salaries and benefits paid the employers were a purpose of the scheme, and thus, were an object of the conspiracy's fraud, rather than merely incidental to the scheme, such that they constituted "money or property" under the wire fraud statute.  Second, the district court did

not abuse its discretion, nor violate the parties' Fifth or Sixth Amendment rights, by dismissing the juror without a separate hearing, as the court had a valid factual basis for dismissal. Third, the district court utilized the amount gained by Russ and Duroseau to determine their enhancements, and no one challenged the use of the gain method or the calculation on appeal. Accordingly, we affirm Appellants' convictions and sentences.

**AFFIRMED.**